Patterson CUDJO, Plaintiff in Error,

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–16752.

Court of Criminal Appeals of Oklahoma.

Oct. 13, 1971.

Rehearing Denied Nov. 8, 1971.

Valdhe F. Pitman, Oklahoma City, for plaintiff in error.

Larry Derryberry, Atty. Gen., Ray Naifeh, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

Patterson Cudjo, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma, for the offense of Rape in the First Degree. His punishment was fixed at life imprisonment, and from said judgment and sentence, an Application for Post Conviction Relief has been perfected to this Court.

Briefly stated, the evidence at the trial adduced that at approximately 11:30 o'clock p. m. on June 26, 1963, Kathleen Parker was parked with her date, Keith Brewer, at approximately Twenty-Fifth and Bryant Streets in Oklahoma City, Oklahoma. She testified that as they were about to leave from this spot, a man, whom she later identified as the defendant, appeared at the side of the car, struck Brewer on the head with a tire tool, and pulled him out of the car and left him on the road. She attempted to run, but the defendant caught her and forced her back into his car. Defendant then held her down in the front seat of his car, and drove north on Bryant Avenue. After driving for some few minutes, defendant stopped the car, yanked her from it, got some sort of cloth from the trunk of his car, and then proceeded with her into a field. The defendant made Miss Parker lie on the cloth, and then proceeded to have intercourse with her, in addition to forcing her to perform oral rectal sodomy. Thereafter, the defendant left, saying that he would be back. Miss Parker began running until she reached a house. The occupants of the house called the police, who arrived shortly, and took her back to where she and Brewer had parked on Bryant Avenue.

They later transported her to a location in the immediate vicinity wherein she observed an automobile which she identified as the same one in which she had been transported by the defendant prior to the alleged rape. It was later established that the police officer found a paper with the defendant's name on it in the car. She gave a description of the assailant to the police officer.

Keith Brewer testified that he was parked with Kathleen Parker, and at about 11:30 p. m., shortly after he had started his automobile, a Negro man came up to the side of his car, pulled him from the car and struck him on the head, knocking him unconscious. When he regained consciousness, he proceeded to a nearby filling station, wherein the attendant called the police at approximately 12:00.

Officer Wilkinson testified that prior to 1:00 o'clock a. m. he was parked near Twenty-Third and Eastern Streets, facing east, and observed about a block away the silhouette of a man crossing Twenty-Third Street. He observed the defendant going over a wall or fence and cutting through back yards and houses. He stopped the defendant and asked him where he lived, wherein the defendant stated the 600 Block on Tenth Street. The police officer said, "You're going the wrong direction to get there." He asked the defendant for identification, wherein he received a radio report, and then placed the defendant under arrest.

The State called other police officers who testified concerning physical evidence. A slip worn by Miss Parker was found in a nearby field. Soil taken from the shoes of the defendant was identified as containing the same seven inorganic elements in approximately the same proportions as a sample of soil taken near where the slip was found. Grass seeds were found on the defendant's arm and in his socks.

A medical doctor testified that he examined the victim and observed a three-inch laceration just behind the cervix. Officer Harrison testified that he checked the defendant shortly after his arrest and observed what appeared to be blood on his shorts and private parts. It was stipulated

by the parties that the blood stains found on defendant's shorts did not compare favorably with the blood type of the victim. Defendant testified that he had worked all day on the day in question, that he spent the earlier part of the evening at the house of his girlfriend, Erma Jean Robinson. He later left and returned to his apartment, and then went to a place called the Ice Dock on Northeast Eighth Street, arriving there at approximately 10:45 o'clock p. m. He remained there until about 11:00 o'clock p. m., and when he walked out to get into his car, the car was missing. He testified that he thought one of his girlfriends' sons might have taken the car and did not call the police. He then proceeded by foot toward Erma's house. He stopped at a laundromat east of Twenty-Third and Eastern Streets and used a pay telephone to call Erma to see if she knew anything about the location of his car. She advised him that she had seen the car at about Twenty-Fifth and Bryant Streets, which was just a block or so from her residence. The defendant then hung up the telephone and was arrested shortly thereafter. He further testified that he always kept an extra set of car keys in the glove compartment of his car. He had the regular set in his pocket when he was arrested. He denied ever seeing the victim prior to his arrest. Other witnesses testified that the defendant was observed near the Ice Dock at approximately the same time as that testified to by the defendant.

Erma Robinson testified that she was the defendant's girlfriend. He called her on the night in question, inquiring about his car, stating that someone had taken it at about 11:00 o'clock p. m. She told the defendant that she had seen it just down the road as she returned home. As she was talking to the defendant, a policeman came to the door, looking for a Negro man who had attacked a white girl, whose description did not match the description of the defendant. She testified that she had had sexual relations with the defendant over an extended period of time, the last being the night prior to his arrest. She described the

defendant as a gentle man with her children and herself.

■ The first proposition asserts that the defendant was denied his right to a fair and impartial trial by reason of the State's systematic exclusion from the jury a member of his race. This Court dealt with a similar question in Bennett v. State, Okl. Cr., 448 P.2d 253, wherein we stated:

"In this same area of his brief counsel submits to the court that he was not tried by a jury of his peers, in that no member of the Negro race served on his jury and there was only one member of the Negro race included in the panel of approximately fifty jurors from which his jury was selected. This argument must fail, the state submits, because it lacks one essential ingredient, that being proof or offer of same that a scheme of discrimination existed in Oklahoma County and in the trial court, whereby Negroes were systematically excluded from jury duty generally in the county and/or specifically from service on the jury that tried the defendant. The mere fact that no Negro served on his jury is insufficient standing alone.

"In the case of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, the Supreme Court of the United States had occasion to consider the allegation of a Negro, who had been convicted of rape by an all-white jury, that he was denied equal protection of the laws by discriminatory jury selection in three respects:

"(1) discrimination in the selection of venires, demonstrated by the fact that while 26 percent of the persons eligible for jury duty were Negroes, the venires contained only 10 to 15 percent Negroes;

"(2) discrimination in the selection of jurors from the veniremen, demonstrated by the fact that the prosecutor used his peremptory strikes in his case to remove all Negro veniremen; and

"(3) discrimination in the use of the peremptory strike system in Talledega County through the years, perverting its purpose in a scheme to exclude all Ne-

groes from ever serving on petit juries there.

"In affirming that conviction, the Supreme Court first set out the general rule in the syllabus of the opinion as follows:

'1. Although a Negro defendant is not entitled to a jury containing members of his race, a state's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the equal protection clause.

'* * *

'3. The Federal Constitution forbids the intentional exclusion from juries of any identifiable group in the community which may be the subject of prejudice, whether or not the group is composed of Negroes.'

"These pertinent syllabi then follow:

'7. A defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the venire or jury roll from which petit jurors are drawn; neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.

'8. The Federal Constitution does not require proportional representation of races and nationalities on juries, and does not permit proportional limitation of races and nationalities on juries.

'* * *

'22. The presumption that a prosecutor used the state's peremptory challenges to obtain a fair and impartial jury is not overcome by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes.'

"The court in that case rejected a much stronger argument and much stronger proof than is submitted here. Counsel in the case at bar would be hard put to show a systematic exclusion of Negroes from juries in Oklahoma County, where Negroes regularly comprise a goodly portion of the venires summoned for jury duty and where they regularly are selected on both grand and petit juries.

"[7] In accordance with the authorities cited, supra, we are of the opinion that his assignment of error is not supported by the record."

The next proposition asserts that the trial court erred in overruling defendant's Motion to Suppress, since the evidence complained of was seized after an illegal arrest of the defendant. The Record reflects that Officer Wilkinson was parked near Twenty-Third and Eastern Streets in Oklahoma City, wherein he observed a man jump over a fence and walk and cut hurriedly through the back yard of some houses. He testified he came down the street and threw a spotlight on the defendant, and at that time, the defendant went over between the houses, so the officer went around the other way. He further testified that as he approached the defendant, he called from the car and asked him where he was going, to which the defendant stated he was going home. The officer asked defendant where he lived, and the defendant stated that he lived in the 600 Block on Tenth Street. The officer replied, "Well you're going the wrong direction to get there, aren't you?" Defendant replied that he was taking a short-cut. The officer asked the defendant for a description, and after observing his driver's license, received a call over the police radio and placed the defendant under arrest.

Officer Greeson testified that from information found in the car left abandoned at the scene, the officers were specifically looking for the defendant. In the case of State v. Chronister, Okl.Cr., 353 P.2d 493, Judge Brett stated:

"* * * If a * * * peace officer * * * suspects one on his own knowledge or facts; *or upon facts communicated to him by others*, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful. * * *" (Emphasis added.)

This also reaffirms a prior ruling in Welch v. State, 30 Okl.Cr. 330, 236 P. 68, which stated:

"The use of the term 'probable cause' or 'reasonable cause' itself imports that there may not be absolute, irrefutable cause."

If the facts are such that a reasonably prudent man would have believed the accused guilty, and would have acted upon that belief, a police officer is justified in making an arrest without a warrant (for a felony). We are of the opinion that officer Wilkinson had reasonable ground to believe that the defendant had been guilty of a felony and that the arrest and the resulting search were valid.

The final proposition contends that the defendant was prejudiced in his trial by the injection of proof that he had committed other and separate offenses. Defendant first objects to the testimony of the arresting officer, Wilkinson, wherein he testified, "And, I asked him if he had ever been arrested, and he stated that he had previously, I think one time for drunk driving and something else." (Tr. 421) Defendant promptly objected to such statement and requested a mistrial. The trial court thereupon conducted a hearing outside the hearing of the jury, wherein the State offered to prove the dimension of the defendant's prior arrest was inadvertent and that the said witness had previously testified to the said matters at the Preliminary Hearing without objection on the part of the defendant. The State further offered to prove that there was no intent to inject any improper evidence and that the record that the prosecuting attorneys had no knowledge that the witness would testify to any such matters and that the testimony in his regard came as a complete surprise to them. The State requested the court to admonish the jury not to consider any of the evidence concerning the possible prior arrests of the defendant, and the State further requested the court to admonish the witness to refrain from any further such evidence. Such offer of proof and motion to admonish the jury was overruled by the trial court.

■■ The defendant next complains of the cross-examination of Erma Robinson concerning the defendant's prior arrests for Public Intoxication. We observe that this testimony was brought out after the witness, Robinson, had testified on direct examination that the defendant was a nonviolent person, that he was extremely gentle toward her and her children, and that on one occasion, he had been drinking and became very angry toward her. Because of her fear that he might hit her, she called the police and filed a Public Intoxication charge against the defendant.

We are of the opinion that the defendant opened the door on direct examination concerning the arrest for Public Intoxication, and that the State could properly inquire into such as tending to disprove her previous testimony as to defendant's nonviolent nature.

■ In conclusion, we observe that the volunteered statement of the police officer that the defendant stated he had been arrested for drunk driving is, in fact, an evidentiary harpoon, condemned by this Court time after time. In Hattensty v. State, Okl.Cr., 321 P.2d 710 (1958), we stated:

"It has been held that similar remarks may not constitute sufficient grounds for reversal where evidence of guilt is clear, but will be considered in connection with the contention that the punishment was excessive as tending to prejudice the defendant with the jury."

We must, thus, decide whether or not the punishment imposed was excessive. We have carefully reviewed the record and are of the opinion that the evidence is sufficient to support the jury's finding that defendant was guilty of a sadistic crime. We, therefore, cannot conscientiously say that the punishment imposed is so excessive as to shock the conscience of this Court. The judgment and sentence is, accordingly, affirmed.[1]

BRETT and NIX, JJ., concur.

---

1. This case was exhaustively reviewed and affirmed in Cudjo v. State, Okl.Cr., 401 P.2d 203.