**Donald NORTON, Plaintiff in Error,**

**v.**

**The STATE of Oklahoma, Defendant in Error.**

**No. A–16711.**

Court of Criminal Appeals of Oklahoma.

Dec. 10, 1971.

Rehearing Denied Jan. 25, 1972.

Mac Oyler, Oklahoma City, for plaintiff in error.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

Donald Norton, hereinafter referred to as defendant, was charged with Pauline Norton and Paul B. Goodwin in the District Court of Custer County, Oklahoma, with the offense of Grand Larceny, After Former Conviction of a Felony. He was tried and convicted for said offense, and his punishment was fixed at eight years imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the lengthy trial, Michael O'Shea testified that he was employed as a detective with the Oklahoma City Police Department. On the evening of May 28, 1970, he was assisting other officers in the surveillance of the defendant's home in Del City, Oklahoma. At approximately 8:20 P.M., he followed the defendants through El Reno and to Weatherford, Oklahoma. The defendants' car stopped at a salvage yard near Clinton and remained there for approximately fifteen minutes, not in the officer's view. As the defendants proceeded back toward Weatherford, the officer noticed that their car tag on the vehicle had been changed to CS–4997. The defendant drove to the Mark Motel, whereupon Mrs. Norton, who was wearing a red wig, entered the motel office. She returned to the car and all the parties entered Room Number 16. In approximately ten minutes the defendant left the room and checked the motel exits, then returned to the room. Five minutes later, he again exited the room and got into his vehicle. He started the engine and turned on the lights. Mrs. Norton came out carrying a suitcase, and Paul Goodwin came out carrying a portable television, which he placed in the back seat. Officer O'Shea followed the car to a rural area, where it was out of sight for approximately thirty minutes before it emerged and returned to Weatherford. The car stopped at the Western Motel, where Mrs. Norton entered the office, and all three later entered Room Number 40 of the motel. At approximately 1:10 A.M., they left the motel and began traveling east on Interstate 40, with Officer O'Shea maintaining surveillance until a blowout wrecked his police car. During the entire period of surveillance, O'Shea was in radio contact with other officers.

James Wheeler testified that he was a special investigator for the Alcohol, Tobacco and Firearms Division of the United States Treasury. He arrived in Weatherford on the night in question at approximately 11:30 P.M., and went to the Mark Motel. After examining the motel register, he and Deputy Gaines went to Room

Number 16. They observed a vacant television stand through the open door. Upon receiving radio communications from other units, they went to the Western Motel. Wheeler, Gaines, and the motel manager then checked Room Number 40. Wheeler subsequently returned to Oklahoma City, arriving at approximately 4:00 A.M., and with Sergeant Vetter of the Oklahoma City Police Department, observed the defendants' vehicle approximately one block from his residence. They stopped the vehicle and placed all three defendants under arrest.

The trial court conducted an evidentiary hearing outside the presence of the jury in support of defendant's motion to suppress. Joe Mayer testified that he was the manager of the Mark Motel, and that he rented Room Number 16 that evening to a husky, red-haired woman. He later inspected the room, and found the color television missing.

Agent Wheeler testified that he went to the room with the manager and observed that the television had been removed. He obtained the serial number of the unit and contacted other officers concerning the defendants and advised that they should be arrested. He gave the other units a description of the car and also both the car tag numbers. Upon stopping the vehicle, Agent Wheeler found a Mark Motel hand towel on the floorboard. He obtained the trunk key from the defendant's pocket, over defendant's objection. Wheeler opened the trunk and found a color television, a red and gray bedspread, and the car tag that had previously been on the vehicle. Mrs. Norton was wearing a red wig.

All three defendants testified at the evidentiary hearing. They testified that after being removed from the car that the defendant asked the officers if they had a search warrant. The defendant testified that Sergeant Vetter stuck a pistol to his head and stated, "This is all I need." Defendant did not consent to the search, and objected several times. Agent Wheeler forceably took the key from his pocket, and opened the trunk. The defendant admitted four previous felony convictions. Goodwin admitted three prior felony convictions.

At the conclusion of the hearing, the court overruled the motion to suppress, and Agent Wheeler testified concerning the search of the trunk.

Clifford Pennington testified that he was a part-owner of the Mark Motel, and that the television in question was purchased on December 20, 1968. The original cost was $239.00, and that the current worth would be between $180.00 and $200.00, allowing for depreciation.

Albert Hazlett testified that he was the manager of the Western Motel, and that on the evening in question, he rented Room Number 40 to an above-average sized woman, who was wearing a red wig. She registered as Mrs. Frank Melton, 415 East Dunn Street, Clinton, Oklahoma. The registration slip showed that the vehicle was a 1967 Dodge with tag number CS–4997. He checked the room along with Agent Wheeler and found the bedspread was missing. He identified State's Exhibit Number Four as a similar bedspread.

Boyd Odell testified that he operated a garage and salvage business east of Clinton, Oklahoma. He had previously purchased a 1957 Buick, which had a 1970 Oklahoma license tag of CS–4997. He first noticed the tag was missing after he was contacted by the sheriff's office.

Larry Upchurch testified that he was a sergeant in the Oklahoma City Police Department. He arrived in Weatherford at approximately 10:45 P.M., and joined Detective O'Shea near the Mark Motel. His observations of what transpired thereafter did not differ substantially from the testimony of O'Shea. He observed Goodwin carrying the television from the motel.

Agent Ohlsen of the Alcohol, Tobacco and Firearms Division testified concerning the arrest of the defendants. Deputy Gaines testified concerning the return of the defendants, and the physical evidence, to Custer County.

Upchurch and O'Shea were recalled by the defendant for further cross examination. O'Shea testified that he received information from an informant concerning the possible activities of the Nortons and Goodwin.

Pauline Norton testified that she was married to the defendant, and that they had a three-year-old child. She stated that on the evening in question, her husband asked her to go with him and Goodwin to western Oklahoma to collect a debt. She did not want to go, but agreed because she was afraid of the defendant. Defendant saw a car tag lying by the side of the road near Clinton, and he stopped and picked it up. Defendant's stomach ulcers started acting up and they stopped at the Mark Motel. Defendant told her to register under the name "Williams" and to put down the car tag number that he found. She was not wearing a wig, but had a red scarf over her hair. Defendant rested a short while, and went outside for some fresh air. Upon his return, he had a conversation with Goodwin to the effect that he had purchased the television. Defendant said he was feeling worse, and that they had better leave. Goodwin carried the television to the car; and they got lost for a while, and then decided to stay in Weatherford. They went to the second motel, and she again registered under an assumed name at the direction of her husband. They rested a while, and the defendant was feeling better, and they returned to Del City. She denied any knowledge of the hand towel or the bedspread being in the car.

Paul Goodwin testified that he lived in Oklahoma City, having been released by a federal court after serving thirty-two years at McAlester, Oklahoma. He testified that on the evening in question he had a fight with his wife, and just went along with the Nortons for a ride. The defendant made a telephone call in Clinton, attempting to collect a debt. They drove to Weatherford, and Mrs. Norton checked into the motel at the defendant's direction. The defendant stated that he had purchased the television for $35.00, and had asked Goodwin to carry it to the car. They left the motel and got stuck, and the defendant put the television in the trunk. They returned to the city of Weatherford, and Mrs. Norton again registered as instructed by the defendant. They stayed about thirty minutes and then decided to return to Oklahoma City. He denied that Mrs. Norton was wearing a red wig, and any knowledge of the bedspread. He admitted a prior conviction for armed robbery.

The first proposition asserts that "The crime, if any crime was committed, was not that of Grand Larceny." Defendant argues that the facts alleged and proven do not constitute grand larceny, but rather embezzlement, or failure to return certain leased or rented property. We are of the opinion that this proposition is patently frivolous. In the early day case of Flohr v. Territory, 14 Okl. 477, 78 P. 565 (1904), the Court stated:

> "If the property in the hands of the taker amounted to a bailment, or if the property went into the possession of the taker with knowledge of the owner *on account of any fraudulent representation by the taker, and the taker received the same intending at the time of its reception to convert the same to his own use and deprive the owner thereof, the crime is larceny.* If, on the other hand, the taker receives the property as a bailment of the same, or with the knowledge and consent of the owner, intending at the time a compliance with the terms of the bailment, or to conform to the owner's wishes concerning the property in his possession, and afterwards converts the property to his own use, and fails to account for the same upon demand, the crime is embezzlement." (Emphasis added)

In the instant case, it is apparent from the evidence presented that defendant had the necessary criminal intent existing at the time of the taking of the room, therefore constituting larceny.

The second proposition contends that the trial court erred in refusing to grant a severance. The record reflects that the defendant filed a demand for severance on September 20, 1970, which was denied on the same date for the reason that there was "no showing of prejudice." At the trial on October 29, 1970, at the conclusion of the State's opening statement, the defendant said:

"[MR. KEEN:] Let the record show each defendant announces to the court that he would like to make an Opening Statement at this time to the jury, but because of the conflict of interests and the conflict between the defendants on their defenses, it is impossible to do so, and therefor each defendant against his desire and wishes, is compelled to announce to the Court that the Opening Statement will be reserved.

"THE COURT: The Court would find as a matter of law in a criminal case for the Opening Statement to be made after the State has closed. They will be given that opportunity then to make an Opening Statement fully.

"If they want to make a request at this time we will consider the request. They will get to make it at the close of the State's evidence if the case goes on from there, but at this time the objection of each of the defendants is overruled and exceptions allowed."

Thereafter, at the close of the State's evidence, the following transpired:

"MR. KEEN: I would state to the court that each defendant would like to have an opening statement made to the jury. They each have one single lawyer being me, Milton Keen. Because of the sharp conflict in the defenses to be presented by each of the respective defendants I find myself incapable of making an Opening Statement for any one of them without it being to the utmost detriment to the others, and going back, of course, to the point that we feel that a severance should have been granted herein because of that conflict of which I have repeat-

edly advised the Court, and under the circumstances I must decline because of my own inability to stretch myself in three ways to to such a distance to protect each of the parties, and to make a proper kind of Opening Statement, I must decline to make an Opening Statement.

"THE COURT: There was a motion for a severance in here which the court did deny, *I still think that if a proper showing of prejudice is made to the court then possibly a severance should be granted.*

*I don't believe up to this point anything has been presented to the court other than your request for severance, and you did say you had some cause or something, but I don't believe the court has ever been informed of what that is.*

*"Was there any other Motion or Request, or any other information you want to give the court at this point?*

"MR. KEEN: We would at this state of the proceedings on behalf of each separate defendant, request the court to declare a mistrial.

"THE COURT: I don't think it would be proper as to all defendants. *If you had any specific point you want to make, or anything you want to point out to the court to any one or two of the respective defendants?*

"MR. KEEN: I think it will develop, I have never concealed that in my original Motion I pointed out, there would be conflicts.

"THE COURT: *The Court has not been advised, and does not know yet what they might be, and you are saying this is a continuing motion.*

"MR. KEEN: *No, it is not a continuing Motion.*

"THE COURT: The Court would state on the basis of what has been presented, and the information given to the Court up to this time, it is overruled with exceptions to each defendant.

"Each defendant is given the opportunity —counsel doesn't have to be advised of that—of representing it at any stage where it might become an apparent problem is developing. The Court would consider and pass on it." (Tr. 264–266) (Emphasis added)

■ We need only to observe from the foregoing recitations that the trial court gave the defendant every opportunity to present a showing to the court of what conflicts existed which would require a severance. Defendant declined on each occasion to inform the court as to what conflicts existed, and further stated that "it is not a continuing motion." We do not condone counsel "laying behind the log." Defendant should have informed the court as to the exact nature of the alleged conflicts wherein the court could properly rule on the same. Because of defendant's failure to do so, he may not complain at this time on appeal.

■ The next proposition asserts that the trial court erred in overruling defendant's motion to suppress. Defendant first objects to the search of the two motel rooms. We observe that the evidence is uncontradicted that both rooms were abandoned. We have previously held that police officers have the right to search abandoned property without a search warrant. Croney v. State, Okl.Cr., 485 P.2d 1062. The United States Supreme Court upheld the search of a vacated motel room in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668.

■ Defendant next argues that the arrest in Del City and the resulting search were unlawful. We observe that the arresting officer had personal knowledge that the television set had been taken from the room without permission, and further, that he had information from another officer who had observed the defendants remove the television set from the room. In Battles v. State, Okl.Cr., 459 P.2d 623 (1969), we stated in the first syllabus:

"If a peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed to render the arrest lawful, but if he suspects one on his own knowledge of facts, or upon facts communicated to him by others, and thereupon has reasonable ground to believe that the accused has been guilty of a felony, the arrest is not unlawful."

■ We thus conclude that the arrest in the instant case was lawful. We further observe that the search of the vehicle was likewise lawful in that after the officers observed a Mark Towel on the front floorboard, they were justified in continuing the search to obtain the further fruits of the offense.

The final proposition asserts that "failure of the court to give a limiting instruction as to the other crimes proven and the 'harpoon' of a police officer prevented the defendant from receiving a fair and impartial trial." Defendant first complains that the trial court allowed evidence of other crimes to be introduced to-wit: the tag from a salvage yard, the bedspread, and the Mark Motel hand towel, without instructing the jury concerning the purpose of admission. We observe that although the defendant submitted ten requested instructions to the trial court, said requested instructions did not include any instruction concerning the question of limiting instruction as to other crimes proven. In Schapansky v. State, Okl.Cr., 478 P.2d 912, we stated:

"This Court has consistently held that:

'Where counsel is not satisfied with instructions that are given, or desires court to give any particular instruction, or to more definitely or sufficiently state any propositions embraced in instructions, it is the duty of counsel to prepare and present to the court such desired instructions and request that it be given, and in absence of such request [Court of Criminal Appeals] will not reverse case if instructions generally cover subject matter of inquiry.'"

It is the opinion of this Court that the instructions generally cover the subject matter of inquiry, and further, that defendant's attempt to raise this proposition for the first time on appeal is untimely.

Defendant lastly complains that Officer Upchurch injected a "harpoon" as to the defendant's character on direct examination. We have carefully examined the record, and observe that the remark was made on cross-examination rather than direct examination, wherein the following transpired:

"MR. KEEN: On what basis were you functioning in western Oklahoma?

MR. MONROE: That is incompetent, irrelevant, and immaterial.

THE COURT: Overruled.

MR. MONROE: Exception.

A. We were assisting the A. T. F. Agents.

Q. In what?

A. On surveillance, the Nortons and Mr. Goodwin.

Q. Were you assisting them on their basis of enforcing the Federal Tax Laws?

A. We were assisting on the investigation, Mr. Keen.

Q. Investigation of what?

A. Well, sir, I can explain.

Q. I would like for you to.

A. I would like to. Earlier in the day information had been received that these three people were going to commit a burglary and—

MR. KEEN: We will object to that as not responsive." (Tr. p. 204)

Although we observe that the remark was invited by defense counsel, we are of the opinion that the response was improper. In the recent case of Cudjo v. State, Okl. Cr., 489 P.2d 1101, we stated:

"In conclusion, we observe that the volunteered statement of the police officer that the defendant stated he had been arrested for drunk driving is, in fact, an evidentiary harpoon, condemned by this

Court time after time. In Hattensty v. State, Okl.Cr., 321 P.2d 710 (1958), we stated:

'It has been held that similar remarks may not constitute sufficient grounds for reversal where evidence of guilt is clear, but will be considered in connection with the contention that the punishment was excessive as tending to prejudice the defendant with the jury.'

"We must, thus, decide whether or not the punishment imposed was excessive."

We have carefully considered the entire record and are of the opinion that the evidence of defendant's guilt is overwhelming. We further observe that this is defendant's fifth felony conviction. Under such circumstances, we cannot conscientiously say that the punishment imposed shocks the conscience of this Court. Judgment and sentence is, accordingly, affirmed.

BRETT, J., concurs.