Kenneth Ray **CASTLEBERRY**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–73–345.

Court of Criminal Appeals of Oklahoma.

April 18, 1974.

Rehearing Denied May 23, 1974.

Paul D. Brunton, Chief Public Defender, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Kenneth L. Delashaw, Jr., Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, Kenneth Ray Castleberry, hereinafter referred to as defendant, was charged by Information with the crime of Murder in Case Nos. CRF–72–359, CRF–72–360, and CRF–72–361 in the District Court of Tulsa County, Oklahoma. All three cases were consolidated and tried before a jury with said trial commencing on March 12, 1973. On March 22, the jury returned a verdict of guilty as charged and penalty was assessed at three (3) concurrent life sentences, and from said judgment and sentence, a timely appeal has been perfected to this Court.

The State first called Barbara Biles, a next door neighbor of the Castleberrys. Mrs. Biles testified that she had had a conversation with Mrs. Castleberry on the 14th day of February, 1972, wherein they discussed money and sex, Mrs. Castleberry complaining that her husband would not seek a better paying job or part-time employment and that her husband did not enjoy sex as much as she did. Mrs. Biles stated that neither she nor her husband had seen or heard anything unusual from the Castleberry home on the evening of the 15th of February. On the 16th day of February, 1972, she first observed the defendant sitting on his front porch. Approximately 15 to 20 minutes later she saw the defendant at her front door. When she opened the door the defendant, appearing white and shaken, staggered in and stated that his family was dead. She and the defendant then went to a neighbor's home to call an ambulance. While they were walking the defendant was mumbling that the family was happy and that he didn't know who could have killed her. Mrs. Biles and Leona Wilson subsequently went over to the defendant's house where she saw blood in the hallway and Mrs. Castleberry's body in the kitchen. She did not touch anything and noticed that the furniture in the front room did not seem to be disturbed.

The State next called Mrs. Grace Stearman who stated that at approximately 6:00 p. m. Mrs. Biles and a man came to her home to use the telephone to call an ambulance. She could not identify the man because he kept his face covered with his hands and made no sounds. When they left, she called her sister, Leona Wilson.

Leona Wilson then testified that upon receiving the call she went to the defendant's house. She and Mrs. Biles entered and saw Mrs. Castleberry's body lying on the floor of the kitchen. Nothing was touched and upon the arrival of the police she and Mrs. Biles left.

Patrol Officer Kenneth Mosier of the Tulsa City Police then testified that at approximately 6:15 p. m. on the 16th he arrived at the Castleberry house where he discovered the body of a female lying on the floor in the kitchen and a body lying on the bed in each of two bedrooms. The back door was kicked in and the screens and windows of the home were secure. He later had a conversation with the defendant in his patrol car, describing his demeanor to be calm, emotionless and cool, or, as he noted on cross-examination, possibly in shock. The defendant stated that he left home on the 16th at about 7:05 to 7:10 a. m., worked all day, had no calls, returned at about 5:15 p. m. and found the house locked. His wife had mentioned that she might go visiting that afternoon so he didn't think anything about it at the time. About 6:00 p. m. he became upset, went to the back and kicked in the back door to gain entrance.

Officer James Brown testified that he saw the defendant in the detective division on the 17th of February, 1972, at approximately 5:30 p. m. where he obtained the defendant's fingernail scrapings. No injury was done to the defendant's hands during the process.

Detective Sgt. Roy Hunt then testified that he arrived at the scene at approximately 6:35 p. m. and found the scene properly preserved. Three bodies were found in the house, Mrs. Castleberry lying in the kitchen on her back, Richard Castleberry, age 2, on a bed in the southwest bedroom and Brenda Castleberry, age 5, on a bed in the middle bedroom. He touched each of the victims at the chin and noticed that they were all set and fixed. He then identified numerous photographs and slides depicting the condition of the home, the positions of the bodies and some pools and apparent trails of blood. He stated that it was apparent that Mrs. Castleberry's legs had been separated after the blood had started to dry on her body. One slide depicted what Sgt. Hunt described as a small palm print and an outline of an ear on the floor. He testified that from the pattern he could determine it was compatible with the blood located on Brenda's right cheek and right ear area. Other pictures depicted a trail of blood toward the bed where Richard's body was found. On cross-examination Hunt stated that a purse had been found which contained no money and that a photograph of the master bedroom depicted that the pillows had certain indentations, with one pillow having a greater indentation than the other. It appeared to him that Mrs. Castleberry had been moved after the attack.

William Caveny, a forensic chemist with the Oklahoma State Bureau of Investigation testified that he examined and analyzed certain exhibits including the fingernail scrapings taken from the defendant and that the scrapings appeared to contain blood. He was unable to determine whether the blood was animal or human or its age and origin. He conducted an examination of fluid taken from the kitchen sink, and it contained blood and what appeared to be epithelial cells, identical to those found on the outer layer of skin. He further identified and typed certain human blood samples found in the home.

Thereafter, Caveny was called as a witness for the defendant and stated that he analyzed eleven knives recovered from the Castleberry kitchen. His analysis of each was negative for blood. It was then stipulated that the work clothes the defendant said he wore on the 16th and the lunch pail which was recovered on the front steps were submitted for analysis, the results being negative for blood or skin.

Detective James Carr then testified that he took a statement from the defendant at approximately 7:15 p. m. on the 16th at the police station. Said statement concerned what the defendant had found at his home when he returned from work. Prior to taking the statement the defendant said that the person who had committed the crimes was possibly sick and in need of hospital treatment. The defendant read and signed a printed rights waiver.

Officer Dale Michael Cheever then testified that he first saw the defendant at approximately 12:50 a. m. on the 17th. The defendant was briefly interviewed and related that when he awoke on the morning of the 16th his wife and two children were asleep, with his son Richard sleeping in the master bedroom with his mother. At approximately 7:00 o'clock a. m. his ride arrived and he went to work. He returned home at approximately 5:00 p. m. on the evening of the 16th and found all doors locked. The defendant waited in front for about an hour before he went to the back and forced the rear door open. Officer Cheever observed that throughout the interview the defendant's "responses were collected, he was rational, he knew where he was at, he knew who I was, fairly collected in every response to me."

Thereafter, Dr. Robert Fogel testified as an expert on behalf of the State. Dr. Fogel related that on the 16th day of February, 1972, he was serving as a Deputy Medical Examiner for Tulsa County, Oklahoma, and had occasion to go to the Castleberry home at approximately 2:00 p. m. He found the body of Marie Castleberry in the kitchen, the body of Richard Castleberry in the southwest bedroom, and the body of Brenda Castleberry in the middle bedroom. He then explained to the jury the phenomena of rigor mortis and postmortem lividity and stated that in all three bodies rigor mortis was complete and postmortem lividity fixed. The bodies were removed at approximately 1:15 a. m. on the 17th to the Oklahoma Osteopathic Hospital where autopsies were performed and blood types determined.

With regard to Marie Castleberry, he found twelve stab wounds on the entirety of her body including four stab wounds in the back. No food material was found in the stomach. Cause of death was the direct result of multiple stab wounds.

During the course of his autopsy, Dr. Fogel took swabs tests for the presence of sperm and seminal fluid. Only one of the swabs from the vagina was positive for sperm. He stated sperm would remain detectable within the vaginal cavity for perhaps 72 hours; however, that he had no way of knowing when she last had intercourse.

With referene to Brenda Castleberry he found numerous stab wounds, one of which extended across the major portion of her neck and another that proceeded directly into the vaginal area. No food content was found in the stomach. He stated that the cause of death was related to the asphyxiation which occurred as a result of the slash wound across the windpipe.

With respect to Richard Castleberry, he observed five stab wounds including a large one across the neck. In his opinion the cause of death was a combination of asphyxiation due to the slash of the windpipe as well as exsanguination. It was his opinion that the instrument used in the killings was a knife with a single cutting edge, and that the blade was at least 3¾ths inches in length and ¾ths of an inch in width.

Concerning the probable time of death, Dr. Fogel stated that he used a number of factors in trying to project the time or probable time of death. These factors included the degree and the presence of rigor mortis; the degree and the presence of postmortem lividity; the degree and presence of putrefaction; the cooling of the body; the actual drop in temperature of the body; known data as to when last seen alive; and an examination of the posterior chamber of the eye to determine the level of potassium in the vitreous humor. Dr. Fogel went on to explain the significance of each of these factors and how he used them. In answer to a hypothetical question concerning the probable time of death of Marie Castleberry he stated "that the time of death was somewhere between midnight of 2–16 and a twelve hour period going to twelve noon of 2–16; twelve noon back to twelve midnight." Thereafter, the following questions were propounded and the following answers were given:

"Q. BY MR. DUNN. Dr. Fogel, based on your observations at the scene,

your observations at Oklahoma Osteopathic Hospital, the tests that you conducted with regard to Marie Ilene Castleberry and your experience in this field, sir, are you able to form a conclusion as to the time of death of Marie Ilene Castleberry in relation to 7:00 a. m. on February 16, 1972?

A. A probable conclusion, yes, sir.

Q. And what is that, please, sir?

A. That the death of Marie Castleberry occurred prior to 7:00 a. m. of the date."

The same questions were then propounded regarding the deaths of Brenda Castleberry and Richard Castleberry, and he responded that their deaths in "all probability" occurred prior to 7:00 a. m.

On cross-examination Fogel admitted the possibility of a sexual assault on the two female victims, that the deaths could have occurred between 7:00 a. m. and as late as 12:00 noon on the 16th, that another knife could have been used in the attacks, that two or more of the subjects could have sustained wounds at the same time, and that the subject of time of death was indeed a very controversial field and cannot be employed with any degree of 100 percent scientific certainty or reliability.

The State next called Detective Sgt. Larry Johnson who testified that at approximately 1:30 p. m. on the 17th he contacted the defendant and brought him to the police station for questioning concerning his general background. The defendant told him that he had been born and raised in Kansas, had been married approximately 5 years, that he and his wife had two children, Brenda age 5, and Richard age 2, that they had moved to Tulsa in 1969, that he worked for Needham Tire Company, that he had lived at his present residence for approximately two weeks prior to the date of the incident, and that his family did not have many close friends in Tulsa, their closest being Claude Johnson, a fellow employee, and his wife.

The defendant related that on the evening of the 15th Claude Johnson and his wife had come over to visit and left at approximately 10:00 p. m. He then locked the doors, went to bed in the southeast corner bedroom and slept until 6:15 a. m. The defendant stated that his wife normally stayed up later to read or watch television. At approximately 7:00 a. m. on the 16th Claude Johnson arrived and the defendant walked back to kiss his wife good-bye. She told him to be quiet and not wake the little boy sleeping next to her and to hurry home that evening. He then looked in on his daughter and proceeded to work with Johnson. After a normal workday Johnson brought him back home at approximately 5:00 p. m. He observed the car in the driveway and found both the front and back doors locked. He placed his lunch pail and mail on the front porch, and took a basketball, which he had taken to work to get patched, around to the back and played basketball for a few minutes. Thereafter, he kicked in the back door. The defendant proceeded into the kitchen and found his wife lying on the floor all covered with blood. He ran down the hallway and observed Brenda and Richard lying in their beds in the same condition. He then ran out the front door to get to a telephone. The defendant stated that at no time did he touch any of the bodies.

Johnson further related that during their conversation on the 17th, the defendant stated that he and his wife got along fairly well. The only problems that they had were over finances, having declared bankruptcy in the latter part of 1971, and sex, Mrs. Castleberry continually telling the defendant he wasn't aggressive enough.

At the end of the conversation the defendant was asked if he would submit to having his fingernails scraped and being fingerprinted. The defendant agreed and the procedures were completed. Johnson further stated that he observed little emotion on the part of the defendant except for "moist" eyes.

Johnson had no further contact with the defendant until the 23rd when Johnson was

advised of a phone call from the defendant and, as a result of said call, Johnson and Sgt. Hunt went to the apartment where the defendant was staying at approximately 6:00 p. m. When the defendant was asked if he wished to see them he responded in the affirmative. The trio then proceeded to the car to talk. Johnson reiterated the defendant's Miranda rights but the defendant stated that he had already heard and understood the same. When they arrived at the police car the witness again reiterated the defendant's Miranda rights. After general conversation the defendant stated that he recalled on the 17th mentioning to Johnson the matter of seeing a minister at a later date and that Johnson had told the defendant that he would go with him if he desired. Johnson then asked the defendant "Do you want to see a minister?" The defendant stated "Yes, that there were some things that he would like to talk about." Johnson then asked the defendant if he had any minister in mind. The defendant stated that he had none. Johnson then said, "Well, Kenneth, I attend regularly at Carbondale Assembly of God Church over on the West side of town, I have a minister out there who I have confidence in, he is a good man, he is a good minister; would you like to talk to him?" The defendant replied that he would.

Johnson called Rev. Harley Pieratt to make arrangements and they then proceeded to the church. When they arrived the defendant asked Johnson to go in with him. They went to the minister's study and after a brief conversation Rev. Pieratt started talking to the defendant and opened his Bible. Johnson walked outside and after a few moments returned to find the defendant and the reverend completing a prayer. Johnson did not remember specifically whether the minister left the study at that time but he did recall asking the defendant if that satisfied what he wanted. The defendant stated that it did, that he had had things on his mind ever since they had talked on the 17th and that the reason he had wanted to come back after the funeral was to talk to Johnson further regarding what was on his mind. Johnson then asked what was on his mind, and the defendant stated, "that in his mind he felt as though he had taken the lives of his wife and children but he did not recall the details of how he had done it." Johnson immediately went to the police car and returned with Sgt. Hunt, and the defendant repeated the statement. Hunt or Johnson then asked the defendant if he would be willing to go back to the residence and go over what he knew, and the defendant acquiesced.

On the way the defendant recalled that the Johnsons had been at his home until approximately 10:00 p. m. He stated that afterward Brenda went to bed and then the defendant and Richard went to bed together in the southeast corner bedroom while his wife remained up. He had no more than gotten off to sleep when Mrs. Castleberry came in and started arguing with him about their financial condition and stated that the defendant should get an extra job. The defendant related that such arguments had taken place before and that soon he became quite angry. The next thing he remembered was that "he got up out of bed and some type of engagement occurred." That is the last thing he remembered. The next morning at approximately 6:15 a. m. the defendant arose and walked to the kitchen and observed his wife lying on the floor covered with blood. He then discovered his daughter and son and "fear and panic gripped him." He didn't know what to do so he proceeded to work. After returning from work he proceeded to the front door knowing "what was on the inside." After waiting outside for a while he went to the back door and kicked it in, entered and observed the family in the same position. He then proceeded to the home of Barbara Biles in search of a telephone.

When the trio arrived at the Castleberry residence they went in and the defendant described where and how he found his family. Officer Johnson then asked the defendant certain hypothetical questions about a knife and what his actions

would be if he realized that he was bloody. Thereafter, they left the residence to go to the office of the District Attorney and arrived at the Tulsa County Courthouse at approximately 9:00 p. m. Shortly thereafter District Attorney Fallis and Major Sollars, Chief of Detectives, arrived. Johnson also stated that Dr. Robert Fogel was present during the ensuing interrogation.

On the following morning, the 24th Johnson again advised the defendant of his Miranda rights and told the defendant that if there was any chance that he didn't perpetrate the crime he should so advise Johnson and Johnson would work on the case until he was able to prove the defendant's guilt or innocence. The defendant responded "Mr. Johnson, I know in my heart I did it, I know I did it, I will just have to face whatever is coming to me."

On cross-examination Johnson admitted that on the initial interview on the 17th he and the defendant had discussed the defendant's personal belief in God and that Johnson had asked the defendant if he would like to confer with a minister or any other person at that time. In response to that question the defendant had stated "No, not at this time but maybe later." Johnson also admitted talking to Dr. Fogel on numerous occasions prior to the defendant's arrest.

After Pat McGavock, a secretary for the Tulsa Police Department, testified as to receiving calls from the defendant for Officer Johnson on both the 22nd and the 23rd, Detective Sgt. Roy Hunt was recalled to the stand. Hunt testified that on the afternoon of the 22nd, as a result of a telephone call from the defendant, he proceeded to the residence of one of the defendant's relatives where the defendant indicated that he would like to talk. They then proceeded to the police station where they talked for up to an hour and forty-five minutes.

Hunt further testified that on the 23rd at approximately 6:00 p. m. he and Sgt. Johnson again contacted the defendant at the apartment as a result of Johnson's conversation with the defendant. They talked to the defendant's father for a few minutes and then the defendant and the officers proceeded to the police car. As they were driving the defendant initiated a conversation with Johnson concerning a minister. Johnson asked the defendant if he still wished to see a minister, and the defendant said he did. The defendant had no minister in mind, and Johnson offered his, saying that Rev. Pieratt was a qualified minister and a fine man. The defendant stated that that would be fine with him. When they arrived at the church the defendant asked Johnson to accompany him. Johnson subsequently returned to the car for a moment and then returned to the church. Ten minutes later Johnson came back to get Hunt and they both proceeded to the pastor's office. Johnson then asked the defendant to repeat what he had earlier stated and the defendant said that "he felt like in his heart and in his mind that he had taken the lives of his wife and his two children." Hunt asked him if he was sure and what made him feel that way. The defendant dropped his head and said "I really don't know, but I know that I did it." Outside the church the defendant was arrested and again advised of his rights to an attorney. The defendant stated "No, sir, I don't want an attorney, I just want to get it straightened up." They then proceeded to the defendant's house as a result of the defendant's response to the detectives' suggestions that it might help him recall the events. On the way to the residence the defendant related that he had gone to sleep on the evening of the 15th and that his wife had awakened him to argue about getting another job. He recalled worrying about his son awakening, arose from the bed, grasped his wife and a struggle ensued. The defendant stated that that was the last thing he remembered until he woke the next morning and discovered the bodies of his family. Sgt. Hunt's testimony thereafter resembled the testimony of Sgt. Johnson concerning the events leading up to the interrogation in

the District Attorney's office during the late evening hours of February 23, 1972.

The State next called Tulsa County District Attorney S. M. Fallis who testified that on February 23rd he went to the courthouse at approximately 9:00 to 10:00 p. m. to meet Officers Johnson, Hunt and the defendant. He then identified and described the tape recorder that was used that evening. He related that he took a recorded statement from the defendant and that the machine exhibited at the trial was the same one he used. He described his experience with the machine and how he tested the same to ascertain that it was functioning properly. After the statement was taken, he marked the tape box and placed the same in a vault. He then related that there were no changes or deletions on the tape from the original taping. The tape was then admitted into evidence and played for the jury over the objection of the defendant. The taped statement contained essentially the same matters as heretofore set out by the defendant in his oral statements to Johnson and Hunt.

On cross-examination it was elicited that the defendant was present in the District Attorney's office for a period of approximately two hours prior to the taping of the statement and that there were a number of individuals present in the room during interrogation, including Dr. Fogel.

Dr. Robert Fogel was then recalled by the defendant and subjected to intense, able and very competent cross-examination concerning the reliability of the factors he used to determine the approximate time of death. The State then rested.

The defense then called four fellow employees of the defendant, including Claude Johnson. They all testified that the defendant had a good reputation for truth and veracity and that his conduct during working hours on the 16th was normal. One of the witnesses, Gerald Logan, the defendant's superior, further testified that the defendant was his very best worker, that he was rather quiet and unemotional, that he was to some extent easily influenced by others and that the witness had never seen the defendant in a fight or argument with any of his fellow employees.

Claude Johnson also testified that he and his wife left the Castleberry home at approximately 10:05 p. m. on the 15th and that he picked the defendant up at approximately 6:55 a. m. on the 16th. He related that the defendant appeared normal that morning and that when they made the return trip that evening the defendant did not act unusual or seem hesitant about wanting to go home.

The defense then called Reverend Clarence Lee Henline, an ordained elder in the Church of Jesus Christ of Latter Day Saints, who testified that he had known the defendant for approximately 2½ years and that the defendant and his wife were subsequently baptized. He stated that the defendant's children apparently trusted and loved him, and that he was not a very aggressive person. Henline stated that he observed the defendant on the 16th at police headquarters and that he seemed to be very shaken, was white, had been crying and had difficulty in standing. He further stated that the defendant had a good reputation for truth and honesty and that he was not aware of the defendant's financial difficulties, although taking bankruptcy is grounds for "disfellowship in our church." He further stated that the defendant was very susceptible to suggestion.

Harley D. Pieratt, minister of the Carbondale Assembly of God Church, then testified that Officer Johnson was a member of his congregation. He stated that around February 23rd he received a call wherein Officer Johnson asked if he could bring an individual out to see Pieratt since the individual had requested to see a minister. Pieratt agreed and he met the parties in his office not knowing the purpose of said meeting. Pieratt talked to the defendant and read scripture to him concerning the confession of sin, and they then prayed. After the prayer, the officers were invited back in whereupon Johnson asked the defendant some questions. The

only statement Pieratt could recall being made by the defendant was "If I did kill my family, I do not remember it."

The defendant's father, Alva H. Castleberry, then testified that the defendant had never had problems with the law. On February 16 the witness came to Tulsa and first saw his son about 2:00 a. m. on the 17th. The defendant was asleep and seemed to be quivering. He first talked to his son on the morning of the 17th at approximately 9:00 a. m. at which time the defendant stated "Daddy, I don't believe it happened." At the time the defendant looked like he was in a daze and seemed to be staring into open space. After making arrangements for the funeral in Kansas, the police were contacted and the defendant given permission to attend. After the funeral he brought the defendant back to Tulsa. On the 23rd when Officers Hunt and Johnson came to the apartment, Johnson advised the witness privately that the police felt the defendant committed the crime and that he had a split personality. He next heard from his son at the police station, and the defendant told him "I am pretty sure I didn't do it."

Kenneth Ray Castleberry then took the stand to testify on his own behalf and related as follows: On February 17, Officer Johnson and another came to his ex-sister-in-law's apartment and took the defendant to the police station. On the way a general conversation was had concerning the defendant's background and family. Upon arriving at the detective bureau fingernail scrapings were taken and Officers Johnson, Hunt and several others discussed with defendant his activities on the night before, his general background, and if the defendant had any possible suspects. On the way home the defendant advised an unknown officer who was driving the car that he belonged to the Mormon Church. The defendant later went to the police station to get permission to go to the funeral and Officer Johnson advised him to contact him when he got back to town. Following the funeral, the defendant returned to Tulsa and stayed with Joanne Castleber-

ry. The defendant called the police station to talk to Johnson and upon learning he was not in, talked to Officer Hunt. Hunt came to his residence and the defendant left with him. En route to their destination, Officer Hunt advised the defendant that they had no suspects and stated that "a person has a certain mental capacity" and "up above that he just goes so high and then he goes kind of temporarily insane." Hunt also talked about the time of death and asked the defendant if he wanted to go to the house. The defendant did not want to go but went anyway. The defendant showed Hunt how he got into the house on the 16th, and the defendant and Hunt walked around and observed blood on the kitchen floor. The defendant responded to Hunt's questioning that he did not remember blood on the morning he left for work. The two inspected the remainder of the house and observed blood in various locations. He stated that he had no blood on his person when he awoke that morning nor had he washed any off. The two then proceeded to the police station and Hunt advised the defendant that he was the only one who could have committed the crime because he was the only one at home during the time of death. The defendant noted that at the police station, Hunt asked defendant to "pray to God." Hunt then left the room, and shortly another man entered and said they were going "easy on the defendant up to now" but "that they were going to start getting rougher."

The defendant related that the next evening Johnson and Hunt returned and asked the defendant if he would leave and talk to them. The defendant responded that he wanted to help them collect more evidence and in the automobile Johnson asked the defendant if he would like to see a minister. The defendant said "It didn't make me no difference." Officer Johnson recommended his minister and stopped and made a phone call and they proceeded to the church. Sgt. Johnson mentioned temporary insanity and told the defendant that he was the only one who could have done it. The defendant stated that they went

inside the minister's office and after exchanging greetings the minister stated that the defendant could believe in Larry, that he was a good Christian, and that defendant could trust Larry. The defendant did not recall if Johnson was in the room at that time or not and added that he spent most of the time alone with the minister. The defendant testified that the minister read several passages from the Bible and that both recited a prayer. Shortly, the officers came in and Johnson asked the defendant if he felt better and the defendant responded that he did. The defendant did not recall making any statements in the church.

Thereafter, they proceeded to the car and the defendant added that he believed in the officers and trusted them. The trio proceeded to the police station and they kept saying they knew the defendant had committed the crime as he was the only one there at the time of death. Upon arriving at the police station the officers stopped the car and Johnson stated that "We won't show you the pictures, we'll just go out to the house." They then proceeded to the defendant's house and on the way the officers stated they were going to make sure nothing happened to him and that he could "maybe get a couple of years at Vinita." Officer Johnson turned on a tape recorder and read defendant his rights. The defendant answered the questions posed to him, the same all being apparently recorded. The defendant again proceeded into the house as he had done on the previous evening. Once again the spots of blood were observed and, as a result of the "repetition", the defendant became confused, stating that they made him believe he did it. After going through the house, all got in the car and proceeded to the District Attorney's office where they waited until the District Attorney arrived. Thereafter, Captain Sollars and Dr. Fogel came in. Various questions were asked of the defendant before the tape recorder was turned on. Defendant testified that he had heard the tape at trial, that he had said those things because Johnson was

going to help him and that he trusted Johnson because he was a police officer. After making the taped statement, the defendant was booked and jailed.

Concerning the death of his family, the defendant related that Claude and Wynona Johnson stayed at the residence until approximately 10:00 p. m. Upon their departure, the defendant locked all the doors, kissed his daughter good-night and the defendant went to bed with his little boy, his wife staying up to watch television. The defendant stated that he did not say anything else to his wife and that when he woke his wife and boy were in bed with him. Defendant got out of bed, got dressed, secured his lunch pail and dirty uniform, and then Claude Johnson picked him up to take him to work. He testified that Claude brought him home that evening whereupon the defendant went to the front door and discovered the same to be locked. The back door was locked also and the defendant sat down on the back porch and then played a little basketball. He later went in the house after kicking in the back door to clean up in order that he might be ready when his wife got home. He figured that she was out shopping. He observed his family upon entering the house and ran out the front door.

The defendant testified that a Dr. Heaver hypnotized him approximately six times. The defendant stated that he is susceptible to suggestion and that the officers convinced him he saw his wife and children dead in the house. However, he stated that he won't believe just any suggestion. The defendant added that he would not have confessed if he had not trusted the officers.

Dr. Salvatore Russo, qualified as an expert in psychology, was the last witness to testify for the defendant. Dr. Russo testified that he had experience as a prison psychologist and had dealt on a number of occasions with people accused of crimes, more specifically, hundreds of persons accused of violent crimes and 12 to 15 accused of murder. Russo stated that he conducted an analysis of the defendant and

ran a number of psychological tests on him. The witness concluded that the defendant was a "quiet, soft-spoken, shy individual with average intelligence who was somewhat passive, dependent and submissive, who did not give any evidence of hostility or violence of sexual preoccupation and who was not neurotic, psychotic, or psycopathic." Over strenuous objection by the State the witness also testified that it was his opinion that it was highly unlikely a person of the defendant's personality would commit this type of crime. This ended the testimony on behalf of the defendant.

On rebuttal the State called Tom Conseen who testified that he saw the defendant about noon on the 18th of February at a local grocery store. At that time Conseen had a conversation with the defendant wherein the defendant revealed that he had been at the police department all morning. The defendant informed Conseen that the police were trying to "pin it on him" and that they had taken fingernail scrapings from him.

The defendant's first proposition in error urges that the trial court committed reversible error in overruling the defendant's objection to the admission of certain statements made by the defendant which are alleged to have been involuntary. In support of this proposition the defendant contends that the admissions and confessions were psychologically induced and therefore rendered involuntary.

In support of this contention defendant cites Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037, wherein the Supreme Court of the United States held as follows, to-wit:

"Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. (Cita-

tions omitted) The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

See also In re Pate's Petition, Okl.Cr., 371 P.2d 500 wherein this Court discusses the applicability of *Culombe,* supra, and holds in its second syllabi as follows, to-wit:

"A confession is inadmissible if obtained under any form of compulsion, so that to receive it in evidence would violate the defendant's constitutional privilege against self-incrimination and is inadmissible if made under such circumstances of hope or fear as to create a fair probability of its testimonial untrustworthiness."

■ However, in *Culombe,* supra, a 33-year-old mental defective with an I.Q. of 64 and a mental age of 9½ years was detained in effective custody by the police for a period of four days. He saw only his accomplice, the police, and his wife who prevailed upon him to confess. He was never informed of his Miranda rights, and his request for counsel was consistently frustrated. In the instant case the defendant was a mature adult of average intelligence. Although questioned on numerous occasions by the police, he was not detained in effective custody until after he advised Detectives Hunt and Johnson that in his mind he believed that he had killed his family. He was free to come and go as he so desired until the 23rd. He was informed of his rights on numerous occasions beginning on the 17th day of February and stated more than once that he did not desire to consult with an attorney.

In *Pate,* supra, the accused's ailing mother and 16-year-old twin brothers were in the same jail where the defendant was incarcerated. The accused was interrogated every day for a week with the State admitting that the sheriff and six to eight officers had interrogated the accused for 6 to 7 hours using the platoon system. The confession was obtained in the "wee hours" of the morning.

The defendant further cites Brown v. State, Okl.Cr., 384 P.2d 54, wherein this Court held that a voluntary statement must proceed from the spontaneous suggestion of a person's own mind, "free from the influence of any extraneous, disturbing cause." However, in that case the accused had been subjected to severe beatings by members of the Texas Rangers to whom the Oklahoma sheriff had surrendered control. It is therefore the opinion of this Court that *Culombe, Pate,* and *Brown* are all certainly distinguishable on the facts.

A reading of the lengthy record reflects that the defendant's motion to suppress was heard and, after the defendant had introduced evidence in support of his contention, overruled by the trial court. Thereafter, and at the conclusion of the trial, the trial judge again overruled defense counsel's motion to suppress. The issue of voluntariness was then presented to the jury under thorough and exhaustive instructions, and the jury by its verdict found the admissions to have been voluntary. The record clearly reflects that the defendant was properly advised of his Miranda rights on numerous occasions, that the defendant did not desire counsel and that his subsequent statements were voluntary and made with the full knowledge and understanding of his right. This Court will not disturb the trial court's ruling permitting the introduction of a confession if supported by sufficient evidence that the defendant knowingly and intelligently waived his rights and understood the consequences of said waiver. Warren v. State, Okl.Cr., 495 P.2d 837.

The defendant, however, urges that he was psychologically coerced by Detectives Johnson and Hunt who relied on the defendant's obvious susceptibility to suggestion, trust in said individuals and those in authority, and strong religious beliefs. We do not agree. There is sufficient evidence to support the trial court's determination that the defendant initiated the chain of events which led to his visiting with Rev. Pieratt in the privacy of his study. It is

therefore the opinion of this Court that the actions of the trial court in overruling the defendant's motions both prior and after trial were both correct and proper. As the United States Supreme Court stated in *Culombe,* supra, :

"  .  .  .  a confession made by a person in custody is not always the result of an overborne will. The police may be midwife to a declaration naturally borne of remorse, or relief, or desperation, or calculation."

The defendant next contends that the arresting officer did not have sufficient reasonable cause to arrest the defendant and, therefore, the subsequent statements made by the defendant were inadmissible. To support this contention the defendant cites Embree v. State, Okl.Cr., 488 P.2d 588, wherein this Court held that an arresting officer's information that a suspect was "involved" in some marijuana "without further details and specifics" did not constitute requisite reasonable or probable cause for belief that the accused had committed a felony authorizing a warrantless arrest.

However, in the instant case the arresting officer was apprised of "further details and specifics." He had extensively investigated the scene and knew that there were no signs of violence other than the blood and the bodies, and that there was no forcible entry into the home other than that admitted by the defendant. The officer knew that the defendant and his wife had engaged in prolonged arguments about financial matters and that the defendant had remained outside of his home for a relatively long period of time before breaking in the door. The officer also knew the relationship of the defendant to the victims and had just been advised by the defendant that he believed he killed his family.

In Stidham v. State, Okl.Cr., 507 P.2d 1312, this Court held as follows, to-wit:

"This court set forth the standard by which facts allegedly constituting 'reasonable cause' are to be measured in

Cudjo v. State, Okl.Cr., 489 P.2d 1101, 1105, as follows:

'* * * If the facts are such that a reasonably prudent man would have believed the accused guilty, and would have acted upon that belief, a police officer is justified in making an arrest without a warrant (for a felony). * * *'

"See State v. Chronister, Okl.Cr., 353 P. 2d 493. There need not be absolute, irrefutable cause. Welch v. State, 30 Okl.Cr. 330, 236 P. 68."

It is therefore the opinion of this Court that the arrest was proper under the circumstances of the instant case.

■ The defendant next urges that the trial court erred in admitting the tape recorded statement taken by District Attorney Fallis on the evening of the 23rd for the reason that the rights recited by Fallis to the defendant on said recording did not advise the defendant that he had a right to counsel prior to any questioning. In support of the defendant's argument he cites Breedlove v. State, Okl.Cr., 516 P.2d 553. In *Breedlove* this Court recently held that warnings which failed to advise an accused that he has a right to the presence of an attorney during any questioning are fatally defective and no evidence obtained as a result of subsequent interrogation can be used against him.

However, in Moreno v. State, Okl.Cr., 504 P.2d 1241, this Court held that where a defendant had been advised of his rights immediately upon arrest and within one day prior to the complained of statement, the statement was admissible. In the instant case the defendant had been repeatedly and properly advised of his Miranda rights throughout the course of the investigation and on the 17th of February had signed a written waiver of same. The record reflects that after the statement made at the church and prior to the taking of the statement in the office of the District Attorney, Officer Hunt again asked the defendant if he wanted an attorney and the defendant stated "No, sir, I don't

want an attorney, I just want to get it straightened up."

It is therefore the opinion of this Court that the defendant had been thoroughly, properly and repeatedly advised of his Miranda rights, including his right to have an attorney prior to any questioning, that the defendant had voluntarily waived his right, and that the tape recorded statement was properly admitted. See also Maguire v. United States, 9 Cir., 396 F.2d 327.

■■ The defendant's next proposition in error urges that the trial court erroneously overruled the defendant's motion for a new trial based on newly discovered evidence. In Stevenson v. State, Okl.Cr., 497 P.2d 1114, this Court, citing Taylor v. State, Okl.Cr., 286 P.2d 730, set out those elements which the trial court should consider in passing upon a motion for new trial on the basis of newly discovered evidence as follows, to-wit:

"1. In determining whether a motion for new trial on the ground of newly discovered evidence should be sustained, the trial court should consider these questions: 1. Is the evidence material? 2. Did the accused or his counsel exercise due diligence to discover the evidence before the trial? 3. Is it cumulative? 4. Is there a reasonable probability that if the newly discovered evidence had been introduced at the trial, it would have changed the result?

"2. The granting of a motion for new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court."

■ In the instant case the trial court held a lengthy hearing, 490 pages of typed transcript, on the motion at which time the defendant presented five witnesses and the State called six witnesses. During said hearing the defendant attempted to show that one Jackie Dean Tandy could have committed the crimes for which the defendant had been convicted and, therefore, there was a reasonable probability that the original trial would have ended in an acquittal or a hung jury. A complete exami-

nation of said portion of the transcript reflects that the defendant through his very able counsel was granted every reasonable opportunity to examine both his witnesses and the witnesses for the State. It is also apparent that the trial court gave defense counsel much latitude in examining his own witness Jackie Dean Tandy.

During the course of said hearing the defendant attempted to introduce through the testimony of one James Lee Mize a purported statement made to him by Tandy sometime in January, February or March of 1972. The State immediately objected that the statement was hearsay and the trial court sustained the objection. The defense then made an offer of proof reciting the hearsay statement by Tandy to be as follows, to-wit:

"Jim, I need to talk to you and my dad said it's all right, go ahead. He said I had been over at Kenneth's house and I was going to get it and I got in some trouble. My dad asked him Kenneth who? And he said, Castleberry. And he said, I need to get out of town. So, dad told him to get in the car."

Defense counsel urged that the hearsay statement should be admitted as a declaration against penal interest.

In support of the defendant's argument that said statement should have been admitted he cites the recent United States Supreme Court case Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed. 2d 297. In the Chambers case one McDonald had been placed at the scene of a murder with a gun in hand by many witnesses. McDonald had subsequently made a sworn confession in writing and confessed responsibility for the crime on three other occasions to friends. During the trial Chambers called McDonald as his witness and McDonald repudiated his confession and offered an alibi. The Mississippi trial court refused to allow Chambers to cross-examine McDonald as a hostile witness since the Mississippi rules of evidence restrained a party from impeaching his own witness. Chambers then attempted to introduce through other witnesses testimony of McDonald amounting to a confession and further attempted to introduce the sworn confession in writing. Again the Mississippi court refused, holding that the law of that State had always been that a declaration against penal interest was not an exception to the hearsay rule. The U. S. Supreme Court reversed Chambers' conviction holding that the hearsay statements were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. The Court further held that the testimony rejected by the trial court bore "persuasive assurances of trustworthiness." The Court then stated as follows, to-wit:

"We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial."

The Chambers case is distinguishable from the instant case on the facts. In Chambers, McDonald's confession was made spontaneously to a close acquaintance shortly after the murder. Each confession was corroborated by some other evidence in the case, i. e., McDonald's sworn confession, the testimony of any eyewitness to the shooting, the testimony that McDonald was seen with the gun immediately after the shooting and his subsequent purchase of a new weapon.

In the instant case, although Tandy was called as a defense witness, defense counsel was given reasonable latitude in his examination of Tandy. Mize could not remember when the statement was made, it being

made sometime in January, February or March. A reading of the transcript of the hearing also reflects that the trial court found that there were no "persuasive assurances of trustworthiness," it being established that Mize's father had earlier been implicated in a burglary by Tandy.

The defendant further argues that in the recent case of Howard v. Jessup, 519 P.2d 913, the Oklahoma Supreme Court modified our rules of evidence to include a declaration against penal interest as an exception to the hearsay rule. In so doing the Court held as follows, to-wit:

> "The rule that where one is not available as a witness, his declarations against interest are admissible in evidence, is not limited to statements where the adverse interest is of a pecuniary or proprietary nature, and applies where his declarations show him to have committed a crime and his testimony is not available because he has refused to testify on the ground that his testimony would tend to incriminate him."

However, in the instant case Tandy was available and did testify on behalf of the defendant and the defense was given reasonable latitude in its examination of the witness.

It is therefore the opinion of this Court that the trial court afforded the defendant every reasonable opportunity to show that new evidence had been discovered which in all reasonable probability would have changed the results of the trial. It is further our opinion that the trial court did not abuse its discretion in holding that the defense had failed in its burden of proof and, therefore, defendant's proposition is without merit.

The defendant's next proposition in error urges that the trial court committed reversible error in admitting incompetent, irrelevant and prejudicial expert opinion evidence concerning the testimony of William Caveny, forensic chemist, and Dr. Robert Fogel, pathologist.

■ In support of his proposition concerning the testimony of the chemist, the defendant contends that, since the expert was unable to determine the age and origin of the blood found in the fingernail scrapings taken from the defendant and was further unable to determine whether the blood was of human or animal origin, his opinion left his testimony so open to conjecture and fraught with peril as to unduly prejudice the defendant in the eyes of the jury. With this contention we cannot agree. The witness was submitted to extensive cross-examination on the part of the defendant, and it was then up to the jury as the trier of fact to weigh the evidence as presented. In Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812, this Court outlined the functions of and the weight to be given expert testimony quoting from People v. Tucker, 1948, 88 Cal.App.2d 333, 198 P.2d 941, 944, as follows:

> "'* * * expert testimony is admissible where the conclusions to be drawn by the jury depend on the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority thereon, and in those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts but the conclusions to which they lead, may be testified to by qualified experts. * * * The law makes no distinction in weighing evidence between expert testimony and evidence of other character. * * * It is for the jury and not the reviewing court to determine the weight to be given such evidence.'"

See also 32 C.J.S. Evidence § 546(70).

■ To support his proposition concerning the pathologist, the defendant urges that Dr. Fogel's testimony amounted to a guess based upon his belief that the defendant was guilty. The defendant points out that, of all the factors considered by Fogel, the last time the victims were seen

alive was the most important. On redirect examination Fogel stated that the evidence that the victims were last seen alive between 10:00 p. m. and 11:00 p. m. on the 15th was "reasonably valid." On recross-examination Fogel was then asked:

"Q: Dr., if there were a person who had seen these people alive at 7:00 o'clock a. m. on the 16th day of February, would that affect your conclusion in this courtroom today?"

"A: If a reliable witness has seen them alive at 7:00 o'clock a. m., is that your question?

Q: Yes, sir.

A: A reliable witness?

Q: Yes.

A: I would have to say yes."

The defendant, therefore, concludes that the doctor was presuming the defendant's guilt since the defendant had made statements that he had last seen his family alive at 7:00 a. m. on the morning of the 16th.

The State contends that Dr. Fogel was an eminently qualified pathologist who had performed approximately 1,600 autopsies and testified in many homicide cases. Fogel arrived at the scene at approximately 8:00 p. m. on the 16th, inspected all the bodies and subsequently performed extensive examinations of same. Based upon all reliable evidence before him, he then arrived at his opinion that in all probability the deaths occurred prior to 7:00 a. m. on the 16th. The State contends that such expert testimony is regularly received into evidence and that it was then within the province of the jury to determine the weight to be given such evidence.

Although there are no Oklahoma cases concerning expert testimony fixing time of death, such testimony is generally admitted in other jurisdictions. See People v. Johnson, 203 Cal. 153, 263 P. 524; Moya v. People, 88 Colo. 139, 293 P. 335; State v. Netherton, 133 Kan. 685, 3 P.2d 495; and Commonwealth v. Vaughn, 329 Mass. 333, 108 N.E.2d 559. It is therefore the opinion of this Court that a properly qualified expert can give his opinion as to the time of death.

In the instant case Dr. Fogel was submitted to grueling cross-examination concerning the basis of his opinion that the victims "in all probability" died before 7:00 o'clock a. m. on the 16th. Fogel's opinion was based upon his knowledge, expertise, experience, and the evidence and data available to him. The expert must by definition be able to make a determination as to what evidence he believes to be controlling in order to arrive at his opinion. Claude Johnson was a neutral witness called by defendant, and the doctor is justified in basing his opinion, in part, on same. The jury was cognizant of the fact that the pathologist had testified on numerous occasions in other cases on behalf of the State and had been called as a State's witness in the instant case. Although there was no indication in the record of any bias or prejudice in favor of the State on the part of Dr. Fogel, the jury, as trier of fact, is the sole judge as to the weight and the credibility to be given to his testimony. See Yellow Cab Transit Co. v. Bethel, 183 Okl. 219, 81 P.2d 667.

The defendant for the first time in his brief urges that Dr. Fogel's opinion was based, in part, on hearsay since the only way Fogel would have known when the victims were last seen alive was through a third party. However, during the trial when the doctor was enumerating the factors he considered in arriving at his opinion, no objection was made concerning the factor requiring hearsay evidence. Therefore the defendant waived any objection to hearsay, and it cannot be raised for the first time on appeal. However a reading of the record as a whole reflects that the defendant himself testified that Mr. and Mrs. Claude Johnson were in his home for a visit around 10:00 p. m. on the 15th. The defendant then called Claude Johnson as his witness and the visit was again confirmed. Johnson was a neutral witness called by the defense, and the doctor is

justified in basing his opinion, in part, on his testimony.

It is therefore the opinion of this Court that the trial court committed no error in permitting Dr. Fogel to testify as to his expert opinion of the probable time of death.

■ The defendant next contends that the trial court committed reversible error in denying the defendant's request to excuse a juror for breaching the rule of sequestration. When trial commenced, the jury was ordered sequestered for the duration of the trial. During the first weekend recess prior to the defendant's presentation of evidence, Juror Norcum fell ill and was sent to the hospital unaccompanied by a bailiff. Once the separation was discovered, the trial court interrogated Norcum who testified that during his two hour visit to the hospital no one at all discussed the merits of the case with him. Norcum further stated that he informed the doctor that he was on a jury in a very serious case and the doctor made no response. After the interrogation the trial court found that Norcum would be an impartial juror and ordered him to return to the jury.

In Cox v. State, Okl.Cr., 283 P.2d 545, this Court in paragraph 7 of its syllabus stated as follows:

"Before the final submission of a case the legal presumption is that the jurors performed their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced."

In the instant case the defendant made no attempt to show any prejudice. Therefore the defendant failed to sustain his burden set out above and said proposition is without merit.

■ Defendant's next proposition urges that the trial court erred in admitting certain gruesome photographs. With this contention we cannot agree. During the trial the trial court examined certain photographs and slides and culled out those which the court found to be objectionable. The trial court then admitted the other photographs and slides as being probative in value.

In Abel v. State, Okl.Cr., 507 P.2d 569, this Court, citing Pate v. State, Okl.Cr., 361 P.2d 1086, held as follows, to-wit:

"'Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant.'"

In *Abel* this Court pointed out that the pictures in that case were not taken after extensive autopsy surgery and were not gruesome. They clearly depicted the various bruises on a child's body and their probative value was not outweighed by the danger of prejudice to the accused.

In Vavra v. State, Okl.Cr., 509 P.2d 1379, this Court held that certain photographs which showed the location of the body and corroborated a pathologist's testimony concerning loss of blood were of probative value. The same holding is applicable in the instant case. The pictures and slides objected to depicted the location and position of the bodies and blood stains found in the home. The witnesses who identified the photographs stated that they were faithful reproductions of the scene, and the record reflects that the pictures tended to corroborate the testimony of other witnesses.

The pictures in the instant case are relevant to the issues before the court, and their probative value is not outweighed by the danger of prejudice to the defendant. Therefore .it is the opinion of this Court

that the defendant's proposition concerning same is without merit.

■ Defendant next urges that the trial court committed reversible error in allowing improper and highly prejudicial rebuttal testimony. As a rebuttal witness the State called Tom Conseen who testified that on the 18th of February he had a conversation with the defendant wherein the defendant stated that the police "were trying to pin it on him." The defendant urges that the question of the defendant's trust of the police in general on the 18th day of February is a collateral issue since he had very little contact with the police until the 22nd. To support his proposition the defendant cites Moon v. State, Okl.Cr., 475 P.2d 410 which holds as follows, to-wit:

"Though the rule is well established in this state that where a defendant takes the stand in his own behalf, he becomes a witness on cross-examination, subject to all the rules applicable to other witnesses, when a defendant as witness is cross-examined on a matter purely collateral to the issue, his answer is conclusive, and he cannot be subsequently contradicted by way of impeachment by the party putting the question."

However, the question of the defendant's trust of the police is not a purely collateral matter. Trust and susceptibility to suggestion are both material parts of the defense theory. In Higgins v. State, Okl.Cr., 506 P.2d 575, this Court recently held that rebuttal testimony going directly to the defendant's theory of defense could not be considered collateral.

It is therefore the opinion of this Court that the trial court did not abuse its discretion in allowing the rebuttal testimony of Tom Conseen in the instant case. See Anneler v. State, 93 Okl.Cr. 437, 229 P.2d 238. The defendant's contention concerning this issue is therefore without merit.

■ The defendant next contends that the trial court committed reversible error in refusing to admit the results of a polygraph examination administered the defendant for purposes of attacking the voluntariness of his alleged incriminating statement. The defendant argues that, although the general rule is that results of polygraph examinations are not admissible into evidence unless a stipulation is entered into, in the instant case due process requires that the results of said examination be admitted for the sole purpose of attacking the voluntariness of the incriminating statements.

In an effort to prove the reliability of the results of polygraph examination a hearing was held on January 30, 1973, wherein the defendant called as an expert witness in the field Lynn P. Marcy, former executive director of the American Polygraph Association and a well-known author and lecturer on the subject of polygraph examinations. Mr. Marcy testified that on January 6, 1973, he administered a polygraph examination of the defendant and that the results of said examination reflected no deceptive responses on the part of the defendant concerning certain questions asked about his alleged incriminating statements. Marcy further stated that in his opinion the defendant did not have conscious knowledge of who killed his family. The trial court, however, held that the results of said polygraph tests were inadmissible and subsequently, after an offer of proof, held the results inadmissible during trial.

The defendant in his brief cites numerous articles and authority for the proposition that the results of polygraph examination when conducted by qualified examiners are ninety-five (95) percent correct. However, this Court is not swayed by the defendant's argument and authority. In the case of Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, this Court set out those factors which occasion the chief difficulties in the diagnosis of deception as follows, to-wit:

" '(1) Emotional tension—,"nervousness" —experienced by a subject who is innocent and telling the truth re-

garding the offense in question, but who is nevertheless affected by

(a) fear induced by the mere fact that suspicion or accusation has been directed against him, and particularly so in instances where the subject has been extensively interrogated or perhaps physically abused by investigators prior to the time of the interview and testing by the lie-detector examiner; and

(b) a guilt complex involving another offense of which he is guilty.

(2) Physiological abnormalities, such as

(a) excessively high or excessively low blood pressure;

(b) diseases of the heart;

(c) respiratory disorders, etc.

(3) Mental abnormalities, such as

(a) feeblemindedness, as in idiots, imbeciles, and morons;

(b) psychoses or insanities, as in manic depressives, paranoids, schizophrenics, paretics, etc.;

(c) psychoneuroses, and psychopathia, as among so-called "peculiar" or "emotionally unstable" persons—those who are neither psychotic nor normal, and who form the borderline between these two groups.

(4) Unresponsiveness in a lying or guilty subject, because of

(a) lack of fear of detection;

(b) apparent ability to consciously control responses by means of certain mental sets or attitudes;

(c) a condition of "sub-shock" or "adrenal exhaustion" at the time of the test;

(d) rationalization of the crime in advance of the test to such an extent that lying about the offense arouses little or no emotional disturbance;

(e) extensive interrogation prior to the test.

(5) Unobserved muscular movements which produce ambiguities or misleading indications in the blood pressure tracing.' "

In Hayes v. State, Okl.Cr., 292 P.2d 442, this Court held that the results of a polygraph examination are inadmissible for any purpose. See also Vetter v. State, Okl.Cr., 506 P.2d 1400.

The State in its brief points out that the polygraph examination was conducted approximately one year after the incriminating statements were made. During the interim period the defendant was under psychiatric supervision and was hypnotized at least six different times. The State suggests that if the defendant is in fact susceptible to suggestion, then during the year of treatment that followed there were many opportunities to reverse the suggestion of guilt. Therefore the tests would be of little value. We think this point is well taken.

Therefore for all the reasons set out above it is the opinion of this Court that defendant's proposition in error concerning the admissibility of the polygraph examination results is without merit.

■ The defendant next contends that his substantial rights were prejudiced by the statement of Dr. Fogel that the evidence of the time that the victims were last seen alive was "reasonably valid." In support of his proposition the defendant urges that this was an infringement upon the province of the jury and, therefore, highly prejudicial to the defendant. However, as discussed above, we cannot agree. The expert witness, by definition, must be able to weigh that data which he believes to be controlling. The statement made by the expert in the instant case informed the jury of one of the reasons for his conclusion concerning the time of death. It still remained the sole responsibility of the jury to weigh the evidence presented. Therefore defendant's contention is without merit.

■ The defendant next urges that the following question asked Claude Johnson by the Assistant District Attorney, to-wit:

" Q : Claude, if Kenneth had confessed to killing his wife and children he

would be telling the truth, wouldn't he? We would have to assume that?"

was improper cross-examination as it invaded the province of the jury. However, an examination of the record reflects that as soon as the question was asked, and before it was answered, the defendant objected to same. The objection was immediately sustained by the court, and the jury was admonished to disregard same. As the question was never answered and the jury immediately admonished, it is the opinion of this Court that no substantial right of the defendant has been prejudiced and defendant's contention is without merit. See Barber v. State, Okl.Cr., 388 P.2d 320.

The defendant next contends that the trial court committed error in admitting the tape recorded statement taken by Mr. Fallis since the State did not lay the proper predicate by showing that all requirements of Brewer v. State, Okl.Cr., 414 P. 2d 559, had been met. In *Brewer* this Court held as follows:

"Sound recordings, if relating to otherwise competent evidence, are admissible into evidence providing the proper foundation is laid, as follows: (1) A showing that the recording device was capable of taking testimony, (2) A showing that the operator of the device was competent, (3) Establishment of the authenticity and correctness of the recording, (4) A showing that changes, additions, or deletions have not been made, (5) A showing of the manner of the preservation of the recording, (6) Identification of the speakers, and (7) A showing that the testimony elicited was voluntarily made without any kind of inducement."

In support of the said contention the defendant urges that the State failed to show that no changes, additions or deletions had been made as there appeared to be a time discrepancy. We do not agree. The record reflects that at the end of the recorded statement Mr. Fallis made the following statement:

"MR. FALLIS: It is now approximately five minutes after 12:00 midnight. Excuse me. Was I wrong with the time there? I should correct that and say by my clock it is now five minutes after 12:00 midnight on this same date. Apparently the corrected time would be 12:25 a. m. on the date of the 24th of February, which means that my clock is approximately 25 minutes off. This will conclude the statement of Kenneth Castleberry."

When the taped statement commenced Mr. Fallis recited that the time was 11:35 p. m. on February 23, 1972. The defendant is arguing that the statement began at 11:35 p. m. and was completed at 12:25 a. m., or approximately 50 minutes later. However it is obvious from the record that the watch Mr. Fallis wore was approximately twenty minutes slow.

Prior to the admission of the tape recorded statement the trial court held a hearing outside of the presence of the jury to determine if all requirements of *Brewer,* supra, had been complied with. This is the proper procedure outlined in *Brewer* as follows:

"When the counsel for defense objected to the introduction of the tape recording, the better practice would have been for the judge to withdraw the jury; listen to the arguments of counsel; hear the tape recordings; and determine if all the recording is admissible and should be heard by the jury. If not, it should have been excluded."

The trial court then made the following finding, to-wit:

"THE COURT: One second. I think that all of the rules in the Brewer v. State cited at Oklahoma Criminal 414 P.2d, 559, have been met and the time element, as I took the time, was definitely in accordance with the timing that was made at the time of the recording."

In other words, the trial court made a judicial determination that no deletions or additions had been made to the tape. The

defendant submits no proof otherwise, and it is, therefore, the opinion of this Court that the trial court did not abuse its discretion in admitting the tape recorded statement into evidence. No substantial right of the defendant had been prejudiced and his contention concerning said tape recorded statement is without merit.

The defendant next contends that the trial court committed error in exercising his procedural discretion regarding rules of evidence in favor of the State and prejudicially towards the defendant. With this contention we cannot agree. A complete examination of the trial transcript reflects that the trial court conducted the trial in the most competent manner. The trial judge, the prosecuting attorney, and defense counsel should all be commended. It is therefore the opinion of this Court that the trial court did not exhibit prejudice or bias in the conduct of the trial, did not abuse its discretion concerning the scope and latitude of cross-examination, and no substantial right of the defendant was prejudiced.

The defendant last contends that the court committed error in not requiring the State to allow inspection of police investigation reports or other evidence in its possession which was favorable to the defendant. Again, we do not agree.

·The defendant argues that it should be the duty of the courts, instead of the prosecutor, to ascertain whether or not the prosecution had evidence favorable to the accused. The defendant also contends that if he had access to all police reports then the lengthy hearing on the motion for a new trial might have been averted. However, no abuse of discretion has been shown on the part of the trial court. The only limitation of the defendant's discovery was the trial court's refusal to allow defendant the "work product" of the law enforcement officers.

In State ex rel Fallis v. Truesdell, Okl. Cr., 493 P.2d 1134, this Court held as follows:

"An accused is not entitled to discovery and inspection of unsworn statements of a prosecution witness in the possession of the State, of the transcript of the statement of a prosecution witness taken by a prosecutor or peace officer during an investigation or preparatory to trial, or of the 'work product' of the State consisting of unsworn statements signed by others than the accused.

"The State's 'work product' shall include reports compiled by a law enforcement agency in the course of its investigation into a criminal offense and statements obtained by prosecuting attorneys and peace officers from various witnesses, for the State, without regard to whether such statements or reports are later sought for the purpose of cross-examination or impeachment."

It is therefore the opinion of this Court that the trial judge abused no discretion concerning discovery and that no substantial right of the defendant has been prejudiced. Defendant's last proposition in error is without merit.

From a consideration of the lengthy record as a whole, we do not find that the defendant has been deprived of any substantial right, but that the issues were fairly presented to the jury, and defendant received a fair and impartial trial. The verdict and judgment appealed from is, accordingly, affirmed.

BRETT, J., dissents.

BUSSEY, J., specially concurs.

BRETT, Judge (dissenting):

I feel compelled to dissent to this decision because I believe defendant's confession resulted from psychological coercion; and as I review the record, that confession remains unsupported by any of the State's evidence. Consequently, I believe defendant is entitled to receive a new trial.

## I

The majority decision quotes from the United States Supreme Court decision in Culombe v. Connecticut, supra, as follows:

"Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. (Citations omitted) The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." 367 U.S. at 602, 81 S.Ct. at 1879.

Following that quotation, the majority decision quotes from this Court's decision In re Pate's Petition, supra, by stating:

"A confession is inadmissible if obtained under any form of compulsion, so that to receive it in evidence would violate the defendant's constitutional privilege against self-incrimination and is inadmissible if made under such circumstances of hope or fear as to create a fair probability of its testimonial untrustworthiness."

The decision then attempts to distinguish the Culombe decision from the instant case by reiterating that Culombe was "a 33-year-old mental defective with an I.Q. of 64 and a mental age of 9½ years [who] was detained in effective custody by the police for a period of four days." Certainly subnormal intelligence is one mental condition which might make an individual more than normally "suggestible and subject to intimidation", (Culombe v. Connecticut, 367 U.S. at 625, 81 S.Ct. 1860) and hence readily susceptible to over-reaching on the part of investigating officers. There are, however, other weaknesses which may produce the same ready susceptibility, and there are other methods of coercing an accused to confess which, while perhaps more subtle, are equally as effective in playing upon such weaknesses

as lengthy detention or sustained and hostile questioning. See Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (using a police officer intimate with accused to falsely play upon his sympathy); Davis v. United States, 9 Cir., 32 F.2d 860, (nocturnal trips to morgue to view mutilated body); McKinley v. State, 37 Wis.2d 26, 154 N.W.2d 344 (trip to morgue to view body ostensibly for identification); see also Williams v. State, 89 Okl.Cr. 95, 205 P.2d 524, disapproving similar tactics. The real question is whether under the totality of the facts and circumstances of this particular case the statement of Kenneth Castleberry was the "product of an essentially free and unconstrained choice," or the result of his will having been "overborne and his capacity for self-determination critically impaired." (Culombe v. Connecticut, supra, 367 U.S. at 602, 81 S. Ct. at 1879.)

It is my opinion that the tactics of the two officers who interrogated Castleberry brought overwhelming psychological pressure to bear upon this defendant and that his statement was the involuntary product of that pressure.

On the evening of the day the bodies of his wife and children were discovered defendant was taken to the police station for routine inquiry. It was during that time that the Elders of defendant's church "Jesus Christ Church of Latter Day Saints," went to the police station to visit with the defendant and offer him spiritual strength. So, it is doubtful that the Tulsa detectives were unaware of defendant's religious affiliation. The Elders were required to wait for fifteen or twenty minutes until defendant was brought out to visit with them.

On the next day, February 17th, Detective Sergeant Larry Johnson again questioned the defendant in the detective division of the Tulsa Police Department. Sergeant Johnson testified that it was on the 17th that he began to suspect defendant of being the person guilty of the crime. However, on the promise that defendant would get in touch with him upon his re-

turn to Tulsa, Sergeant Johnson permitted defendant to go to Kansas to bury his wife and two children. Defendant returned from Kansas on February 22nd and attempted to get in touch with Sergeant Johnson. After the defendant telephoned for him several times, Sergeant Hunt responded to the call and later went to where defendant was staying and picked him up in the unmarked police car to go to the police station where they could talk in private.

En route to the police station Sergeant Hunt took the defendant to his former residence, where the bloody stains were left untouched, and they entered the front door. Defendant testified that they went to the kitchen, where his wife's blood stains remained about the room, and they stood there for several minutes while the detective asked defendant if it reminded him of anything. Defendant related that it reminded him of finding his wife there. They then proceeded to each of the two other rooms where each of the two children were found; they stood in each room for several minutes with the officer asking if those sights reminded defendant of anything. Defendant repeated each time that it reminded him of finding the bloody bodies of his two children. After being in the house for some twenty minutes, the two men proceeded to the police station where Sergeant Hunt continued to question the defendant. Later that night, defendant was returned to where he was staying.

The next day, February 23rd, Sergeant Johnson and Sergeant Hunt picked up the defendant about 5:00 p. m. to go to the police station for further questioning. En route to the police station, Sergeant Johnson asked defendant if he would like to go to see a minister. Defendant testified that he answered, "I told him it didn't make me no difference." So, Sergeant Johnson, who had already gained defendant's complete confidence, called his own minister and arranged for the minister to talk to the accused man. They proceeded to the minister's office where certain scriptures were read to defendant.

Detective Johnson's minister, Reverend Harley D. Pieratt of the Carbondale Assembly of God Church, testified concerning that visit. He related that he read to defendant from Romans Gospel, 10th Chapter, 9th verse, 10th verse, and the 13th verse, as follows:

"That if thou shalt confess with thy mouth the Lord Jesus and shalt believe in thine heart that God hath raised him from the dead, thou shalt be saved.

"For with the heart man believeth unto righteousness and with the mouth confession is made unto salvation. For whosoever shall call upon the name of the Lord shall be saved.

\*    \*    \*    \*    \*    \*

"If we confess our sins he is faithful and just to forgive us our sins and to cleanse us from all unrighteousness."

Reverend Pieratt testified that he then prayed with the defendant and that defendant repeated the prayer, which Reverend Pieratt said was a prayer "similar to the one I pray with sinners." Reverend Pieratt was then asked, "Did Ken Castleberry make any statements?" The Reverend answered, "The only statement I remember Kenneth Castleberry making, he said, 'If I did kill my family I do not remember it.' [1]"

When the three men left the church, Sergeant Johnson placed defendant under arrest for the crimes and advised him of his Miranda Rights. Then, in order to assist the defendant to "clear things up," the officers again took defendant to visit the scene of the crime where they again followed much the same procedure defendant and Sergeant Hunt had followed the day before. However, this second visit lasted for some one hour, during which time the two detectives suggested their theory of the case to defendant and further interrogated him. The pathologist later testified that the deaths could have occurred between midnight of February 16 and a twelve hour period going to twelve o'clock noon. The officers, however, informed defendant that the time of death was prior to 7:00 a. m. This time was

premised upon the doctor's "probable conclusion" that the death of defendant's wife occurred prior to 7:00 a. m. Nonetheless, defendant was made to believe that the time of his wife's death was definitely determined to have occurred prior to the time he left for work at 7:00 a. m. of the morning of February 16. During the same period of time, the two officers discussed with defendant the possibility of temporary insanity and other possible consequences of such condition, and led him to believe their intent was only to help him, if he committed the crime.

Upon leaving the scene of the crime, the three men stopped and bought hamburgers while Sergeant Johnson called the district attorney and Sergeant Hunt called Dr. Fogel, the pathologist, to meet them at the district attorney's office. They arrived at the district attorney's office about nine o'clock p. m. and waited some twenty minutes for the others to arrive. When all parties arrived, including Chief of Detectives Sollars, defendant was questioned further. About 11:55 p. m. the district attorney commenced to tape record defendant's statement, which was concluded about 12:25 a. m. on Feburary 24th. This confession, or admission, was introduced into evidence over vigorous objections of defense counsel.

At the hearing on defendant's Motion to Suppress the Confession, the Judge denied the Motion, but stated during his ruling, ". . . a conversation ensued and the defendant was taken to the detective's preacher. The testimony would seem to be that that was not at the insistence of the detective. Had it been at the insistence of the detective then I think that your (defense counsel's) point would be well taken." Notwithstanding, on the question of mental duress, Judge Green denied defendant's Motion to Suppress. At trial, a hearing was again held outside of the hearing of the jury and the trial judge again denied defendant's objections to the introduction of the alleged confession. I believe both decisions were erroneous, and that the confession should not have been admitted

into evidence. This fact is critical because there is an absence of any other substantial evidence that defendant committed these crimes.

## II

There is no evidence in this record which directly supports the confession given by defendant. Reference is made to circumstantial evidence supporting the confession, but those circumstances consist of such facts as the time defendant arrived home, that he kicked in the back door, etc. The only other circumstance as discussed in the majority decision is the single witness, "a next door neighbor," who testified that on February 14th, she and Mrs. Castleberry "discussed money and sex, Mrs. Castleberry complaining that her husband would not seek a better paying job or part-time employment and that her husband did not enjoy sex as much as she did." In my opinion, this story became the foundation of the psychological pressures exerted upon defendant which ultimately resulted in the confession.

Every witness who knew the defendant testified that he was susceptible to suggestion, passive in nature, and never engaged in fights. Dr. Salvatore Russo, a qualified psychologist who administered a battery of nine universally accepted psychological evaluation tests to the defendant, described him as being "quiet, soft-spoken, shy individual with average intelligence who was some passive, dependent and submissive, who did not give any evidence of hostility or violence or sexual preoccupation and who was not neurotic, psychotic or psychopathic." He then was asked to summarize defendant's personality in one word, which he gave as "submissive."

During the direct examination of Dr. Salvatore Russo, over the objection of the State, he was asked the following hypothetical question, and gave the following answer:

Question: "Doctor, do you have an opinion, based upon your experience and training as to whether a man who exhibits those personality traits that you have

described in your testimony would have a propensity to commit a multiple murder involving physical mutilation of the victims? Do you have such an opinion, sir?"

Answer: "In my opinion I think it is very, very unlikely that a person with the type personality that we have talked about would or could commit this type of crime and I think it is highly improbable that this kind of crime could have been committed by this type of personality."

It is my opinion that the evaluation of defendant's personality is equally as acceptable as the pathological report offered by the pathologist. Each such evaluation is premised upon certain facts derived from known test factors, which provided probable results subject to professional evaluation. Consequently, I believe that the psychological evaluation of the defendant as a submissive individual supports the contention that defendant was highly vulnerable to psychological coercion prior to the time he was called upon to make the tape recorded confession. It is completely clear that defendant was questioned on at least three different days and was subjected to some fifteen hours of suggestions and questions prior to the time the tape recording was made.

With reference to the unusual visit to the minister's office, Sergeant Johnson testified that, "on the 17th when we talked we had discussed the fact that he would even —that he wanted to see a minister and talk to a minister at a later date and he brought up the fact again that I had told him on the 17th that I would go with him to a minister if he wanted me to. And so, I asked, I said, 'Do you want to see a minister?' And he stated, yes, that there was some things that he would like to talk about. So, at that time, I said, well, Kenneth, I attend regularly at Carbondale Assembly of God Church over on the West side of town, I have a minister out there who I have confidence in, he is a good man, he is a good minister; I said, would you like to talk to him. And he replied that he would, that that would be fine.

So, I believe at that time we were proceeding down Eleventh Street and I just asked Sergeant Hunt if he would find a pay phone, I wanted to call the minister and see if he was in and make an appointment with him." This occurred on February 23rd, while the officers were on the way to the police station to further interrogate the defendant.

The question immediately arises: Why didn't the officer ask defendant if he wanted to talk with his own minister? A corollary question might be: Was the minister prepared in some manner to discuss defendant's "sins" with him at this time. Then immediately following the minister's "chat" with defendant, why was it necessary to return to the "bloody residence" again for an hour. Was this part of a scheme or plan to inculcate in defendant's mind that he must have been the one who committed the murders? Up until this time defendant had constantly denied that he committed the murders; and at the conclusion of his visit with the minister he said, "If I did kill my family, I do not remember it." But within a couple of hours after the three men entered the "bloody residence" defendant was taken to the District Attorney's office where for an hour or more the five men, including pathologist Dr. Fogel further "reasoned with him." There are too many inferences in this record for me to accept defendant's confession as being entirely voluntary.

In People v. Leyra, Court of Appeals of New York, 302 N.Y. 353, 98 N.E.2d 553 (1951), that court was confronted with a similar situation which involved the use of a psychiatrist who questioned, suggested and hypnotized the defendant until he made a confession. That court found that the confession was inadmissible. With reference to using a psychiatrist to aid in obtaining the confession, the New York Court stated:

"If a physician may be thus used, then why not a lawyer or clergyman? The essential fairness which is supposed to form the warp and woof of our fabric of justice would certainly be wanting if

practices such as these were to be approved. See People v. Levan, 295 N.Y. 26, 64 N.E.2d, 341."

I note, only parenthetically, that in the instant case the police, as well as employing the services of Officer Johnson's clergyman also utilized the services of Dr. Fogel, the pathologist who determined the time of death, in questioning the defendant prior to taking his tape recorded statement. The extent of Dr. Fogel's participation, however, is not shown by the record.

In the case of McKinley v. State, 37 Wis.2d 26, 154 N.W.2d 344, the Supreme Court of Wisconsin held inadmissible a confession obtained an hour and a half after the defendant had been taken to view the body of the man she was suspected of having murdered. In so holding the court stated:

> "In situations such as we have here, where a confession is made within an hour and one-half or an hour and 40 minutes after the police have taken the accused into the morgue to view the body of the deceased, the issue of the voluntariness of a confession should not be permitted to turn on a finding of the trial judge that such morgue viewing had no psychological effect in inducing the questioned confession. Rather, we deem that where the confession follows the morgue viewing as closely in time as occurred here it should be held as a matter of law that the confession is the result of such psychological pressure as to render the same involuntary."

In the instant case the defendant was transported from his session with Officer Johnson's clergyman back to the scene of the crime where the officers and defendant again toured each bloody room of the house. According to Officer Johnson's testimony, they remained at the scene thirty to forty-five minutes while the officer posed hypothetical questions to the defendant about how the crime might have been committed. From there the defendant was transported by the officers to the Tulsa County Courthouse where three hours later, at midnight, the tape recording of his confession was made.

There is no doubt that torture of the mind is just as contrary to inherent fairness and basic justice as is torture of the body. It is not so much a question of whether or not defendant was advised of his constitutional rights in this case, as it is a question whether or not he was capable of utilizing those rights in face of the over-powering circumstances confronting him. The record reflects that this defendant was twenty-one years old at the time, had only a tenth grade education, had never before been arrested, and had never been confronted by police authority. At the conclusion of defendant's alleged confession, Sergeant Johnson asked defendant: "Why have you given this, [recorded statement] Kenneth?" The defendant answered: "Because I feel that I need some kind of medical help and I think that you people here in this room could give it to me."

### III

In view of the lack of physical evidence offered at this trial, I believe the Public Defender offered sufficient evidence at the hearing on the motion for new trial to warrant the granting of such new trial. It must be borne in mind that the Public Defender's office does not enjoy the benefit of the Tulsa Police Department, nor the assistance of the District Attorney's investigator's staff to obtain evidence for him. The Public Defender had only the assistance of his limited staff including legal interns, law students who are permitted to participate on a limited basis, to rout out evidence. Notwithstanding, there was more testimony at that hearing implicating one Jackie Dean Tandy with the commission of these homicides than was offered against the defendant at his trial. At the hearing on the motion for a new trial, defense counsel was required to call Tandy as his own witness instead of the trial court calling the witness as the court's witness, as defense counsel had requested. Consequently, defense counsel was denied

cross-examination of the witness. It seems apparent that the prosecution would have no desire to develop any testimony on cross-examination which would refute its earlier case. Consequently, I cannot agree with the majority decision which recites: "However, in the instant case Tandy was available and did testify on behalf of the defendant and the defense was given reasonable latitude in its examination of the witness." To say that Tandy testified "on behalf of the defendant" is an over-statement. Defendant was asserting that Tandy may have committed the murders because the witnesses testified that they saw Tandy on the day of February 16th, with blood on his pants, shirt and shoes. Why then would Tandy testify in behalf of the defendant? I would have granted the motion for new trial and then called upon the police investigators to rout-out the truth of the matter.

IV

I also question the propriety of admitting into evidence the fingernail scrapings which were admitted as states exhibit No. 26. Witness Caveny, the laboratory expert, testified that ten vials of substance were submitted to him. After he examined them under a microscope he determined that two might be worthy of being examined for blood content, one vial marked L–2 and the other marked R–5. So he conducted two tests to determine whether or not blood might be contained in the scrapings. He related the Benzidine Test and the Phenolphthalein Test both indicated the presence of blood. But on cross-examination, Mr. Caveny related that he could not determine whether the blood was human or animal, nor was there sufficient content to determine the blood type. He also admitted that other substances such as milk and certain fruit juices could interfere with the test results. In substance, the testimony of Mr. Caveny was far from being conclusive that the substances obtained from only two of defendant's fingernails was blood. Notwithstanding, the prosecutor stated in his closing argument.

"[W]e found blood evidence under fingernails of each of his hands . . . . So, how did they get those minute scrapings of blood out from underneath his fingernails, where did they come from? Connecting Kenneth Ray Castleberry? I think so. To the killings? I think so under the evidence."

Notwithstanding the argument of the attorney general's brief, this evidence is of such inconsequential nature that it should not have been offered, let alone admitted. It is to be remembered that this defendant worked with his hands in a tire shop. The possibilities of finger injury sufficient to cause his own bleeding was great, but that was apparently not considered. Admittedly, had blood been found under several fingernails of each hand, or even several fingernails of one hand, the scrapings would have borne more significance. But instead, with such a minute example, the prosecution presumed to tie defendant into these murders where great amounts of blood were available. This appears to be one of the types of evidence the State relies upon to support the alleged voluntary confession. I disagree. I believe the evidence should not have been admitted, and that such admission constituted prejudicial error. See Young v. State, Okl.Cr., 373 P.2d 273, 284:

"Criminal Court of Appeals will not reverse a case for ruling on evidence occurring at the trial unless the record discloses a miscarriage of justice, or that the error relied on constituted substantial prejudice to defendant's rights."

In his closing argument, the prosecutor relied to considerable extent upon this finding to overcome the reasonable doubt. As I review this limited bit of evidence, I find it constituted substantial prejudice to defendant's rights.

V

I question the validity of introducing all the photographs into evidence, and especially those of the two children. Some validity may exist for the introduction of the photographs of Mrs. Castleberry's body,

because as the assistant district attorney explained, the position in which her body was found revealed something, but the only purpose the photographs of the two children could have fulfilled was to inflame the jury's prejudices. Two black and white photographs were introduced of the children, as well as two color slides showing them on their respective beds. Their conditions had already been described by several witnesses including the pathologist who described in detail the lacerations found on their bodies. Consequently, I believe prejudicial error occurred when those photographs were introduced, notwithstanding the fact that numerous other photographs were eliminated from the total offered. I fail to see what they proved, beyond what had already been proved, except to visibly show that the bodies were found in a gruesome condition, and to stimulate the prejudices of the jury.

I believe the citation taken from Commonwealth v. Peyton, 360 Pa. 441, 62 A.2d 37, 41, wherein the Supreme Court of Pennsylvania provided the following, best states the proper position of any court:

> "Admission of photographs in a homicide case showing the body of the deceased is largely within the discretion of the trial judge and error will not be predicated by this court on the admission of such exhibits unless there is a flagrant abuse of discretion. The practice of admitting such exhibits unless they have essential evidentiary value is condemned. When the facts that these exhibits would tend to prove can be proved by testimony without the use of photographs which tend the excite the emotions of those who view them, such testimony should be used exclusively and photographs should not be admitted."

The prosecutor asserted to the trial court that the photographs of the children showed that they were carried back to their own individual rooms; but I fail to see the verity of such statement. I can see instead how they must have aroused the jury's passions and prejudices. Their only

purpose was to prejudice defendant in the interest of securing a conviction by any means. Pictures of objects which no normal or reasonable person could view without revulsion and hatred for the one who had, allegedly committed an act bringing about such a vile result could only insure the result desired by the prosecution—to arouse the prejudice of the jury against the defendant.

## VI

I think the time has come when this Court should review its position with reference to polygraph tests when such tests are found to have been administered by competent operators. In the instant case defendant did not offer the polygraph test results to show that he was not guilty; but instead to show the involuntariness of the confession presented on the tape recording. For this limited purpose and under the facts of the instant trial, I believe those tests should have been admitted for what probative value they might have had. That proof would have been subject to attack by the prosecution as any other scientific or expert testimony. Henderson v. State, supra, was decided in 1951, and since that time considerable improvement has been made in this area. Dr. Lynn P. Marcy, who is imminently qualified as a polygraph operator, explained in detail the scientific approach he made in preparing for the tests, which included evaluating the psychological tests to which defendant had been subjected, as well as administering other such tests.

In Vetter v. State, Okl.Cr., 506 P.2d 1400 (1973), in which I concurred, this Court recited:

> "The Court can find no Oklahoma case in which the results of a polygraph test have been admitted into evidence and the Court finds no reason for the results of such a test to have been admitted in this case."

Of course, so long as this Court—and other appellate courts—rely solely upon

stare decisis in the matter of scientific evidence, a test such as the polygraph will never be admitted at trial however, great the advances made in the particular field. I believe—under the facts of this case— that the test results should have been admitted for what probative value they might have and for the limited purpose of testing the voluntariness of the alleged confession. This is especially true since the most convincing evidence against defendant was the confession.

Therefore, for the reasons stated herein, I feel compelled to dissent to this decision and believe defendant should be granted a new trial. Having read the transcript of the expert testimony of the findings of the scientific tests which were admitted into evidence in this case, I am convinced that the evidence of the results of the polygraph test administered to defendant could not have been less uncertain than the scientific evidence which actually was admitted.

BUSSEY, Judge (specially concurring with Presiding Judge Bliss' opinion):

I am in accord with the views expressed in this opinion by Presiding Judge Bliss. The factual situation, fairly and fully set forth in his opinion, is supported by the record, unlike the facts extracted from the record to support a pre-determined conclusion of the author of the dissent. The dissenter follows his customary pattern of accepting, in its totality, the conclusions reached by Dr. Russo, and at the same time rejects and repudiates the admissibility of the conclusions as reached by the pathologist, Dr. Fogel, and the chemist, Mr. Caveny. In stressing the importance of the testimony of Dr. Russo, the dissenter seizes upon the conclusion that the defendant was a submissive person of average intelligence, and later argues that the defendant was 21 years of age and was equipped only with a 10th grade education. Although the author of the dissent acknowledges that the defendant conferred with the Elders of his church prior to his later conference with Reverend Pieratt, he places special emphasis on the latter conference as subjecting the defendant to psychological and coercive pressures. There is nothing in the record before us that would indicate that the defendant's conference with Reverend Pieratt was without his acquiescence or consent, but to the contrary, unless we usurp the functions of the jury, the only logical conclusion that can be reached is that the defendant, whether through a feeling of remorse or guilt, or in order to seek the solace which he, as a Christian, needed, at a time of great emotional distress, freely and voluntarily sought the conference, participated in it, and apparently received some comfort and satisfaction from it.

While it is true that the investigating officers strongly suspected the defendant of commiting the multiple homicides, and on more than one occasion returned him to his residence where the blood-stains remained, and questioned him regarding his recollections, such procedure might have developed evidence exculpatory of the defendant. Certainly, had this been the case, I am sure that the dissenter would have found no fault with the routine, detailed, and deliberate method employed by officers seeking the true identity of the perpetrator of these horrible crimes.

The dissenter acknowledges that the defendant was fully advised of his Miranda rights and gave a tape-recorded statement to the District Attorney; that he had been treated in a humane manner and had confidence in the police officers at the time of giving his statement. This does not, in my judgment, negate the truthfulness of his statement, nor its voluntary nature. That the defendant realized he was in need of psychiatric and mental care, and believed that the officers and the courts might afford him such treatment, does not, when considering the totality of the circumstances, create a prima facie case of subtle psychological coercion tending to compel an involuntary statement. It is well recognized in all jurisdictions that when a mul-

tiple homicide occurs, psychological evaluations and mental treatment may be necessary, notwithstanding the fact that at the time of the commission of the act the defendant was criminally responsible for his deeds. The enormity of the crime, or crimes, does not obviate the necessity for such treatment and police officers, judges, and members of the general public, recognize the necessity of attempting to achieve this end. That the defendant did, in fact, consult with the psychologist, Dr. Russo, should conclusively give verity to this premise.

Judge Brett, while acknowledging that he concurred in Vetter v. State, Okl.Cr., 506 P.2d 1400, which held that:

"The Court can find no Oklahoma case in which the results of a polygraph test have been admitted into evidence and the Court finds no reason for the results of such a test to have been admitted in this case"

would give an exception to that rule to justify his desired conclusions. When the reliability of the polygraph examination has reached that degree of scientific development, I have no doubt that this Court as presently constituted, or as it may be constituted in the future, will hold the same admissible. We do not believe at this time it has attained that degree of scientific development which would render it admissible and we would reach the same conclusion had the examiner expressed a different view.

The dissenter also attacks the admissibility of the fingernail scrapings and the analysis of the chemist as being inconclusive and having no probative value. The testimony of the chemist, like the testimony of the medical examiner, Dr. Fogel, and that of Dr. Russo, the psychologist, are all equally admissible and the weight and credibility to be given their testimony and the inferences to be drawn therefrom, are matters for the determination of the jury and not for the judges on review.

It is the duty of both the trial and appellate courts, to interpret the law, rule on the admissibility or inadmissibility of evidence, and properly apply that law to the facts as determined by the jury, and it is not within the province of either the trial or appellate court to usurp the functions of the jury even when the evidence of the State and defense are in sharp conflict with each other. This forms the fundamental bulwark of American jurisprudence and although an appellate judge may place more credence in the testimony of one of the witnesses testifying at the trial, and give less credence to the testimony of another witness, such is not the function of the Court.

Having heretofore concluded that the testimony of the analysis of the fingernail scrapings were admissible, then it was proper for the prosecuting attorney to argue the probative value of such evidence and the reasonable inferences to be drawn therefrom, and I do not believe that the closing argument of the District Attorney was improper. The photographs admitted in evidence of the victims were material, competent, and had a probative value, for it is often said that a single picture is worth a thousand words. The location of the bodies and the wounds inflicted, certainly were competent to establish that the cause of death of the victims were other than natural and tended to establish the commission of the crime of Murder.

In the dissent, Judge Brett asserts that there is no evidence tending to corroborate the confession. On viewing the evidence in its entirety and drawing the inferences therefrom, it is abundantly clear to me that the corpus delicti was established, independent of the confession, and that it and the facts and circumstances adduced on trial corroborate the confession and I am of the opinion that defendant's guilt was established beyond a reasonable doubt.

As to Judge Brett's view that the Motion for New Trial should have been granted, I believe even the most cursory examination of the record and application of the law to such evidence, amply supports the trial

court's ruling and Judge Bliss' disposition of this matter.

In conclusion, I can only add that although the case was a lengthy one, both counsel for the State and for defense, should be commended for the manner in which they conducted themselves, as indeed, did the trial judge.